Alan L. BALDWIN and George Q. Cannon, Jr., Plaintiffs-Appellees,

v.

REDWOOD CITY et al., Defendants-Appellants.

Alan L. BALDWIN and George Q. Cannon, Jr., Plaintiffs-Appellants,

v.

REDWOOD CITY et al., Defendants-Appellees.

Nos. 75–1412, 75–3132, 75–3042 and 75–3529.

United States Court of Appeals, Ninth Circuit.

Aug. 9, 1976.

Rehearing Denied Sept. 14, 1976.

David E. Schricker, City Atty. (argued), Redwood City, Cal., for appellants in 75–1412 and 75–3132, for appellees in 75–3042 and 75–3529.

Wayne Scott Canterbury (argued), of Graham & James, San Francisco, Cal., for appellants in 75–3042 and 75–3529, for appellees in 75–1412 and 75–3132.

## OPINION

Before BROWNING and CHOY, Circuit Judges, and SKOPIL,* District Judge.

BROWNING, Circuit Judge:

Alan L. Baldwin and George Q. Cannon, Jr., property owners, residents, and registered voters of Redwood City, brought this action for injunctive and declaratory relief challenging certain Redwood City ordinances governing the display of temporary signs, including political campaign signs, as violative of the First Amendment. Baldwin and Cannon filed their complaint less than a month before the April 9, 1974, general election in Redwood City. They stated that Redwood City's temporary sign regulations had prevented them from erecting signs on behalf of a candidate for Redwood City Council, subsequently defeated in the April 1974 election.

Redwood City has adopted a detailed code governing the erection, location, and maintenance of all types of signs within the city. The challenged provisions are found in a division of this code dealing with "temporary signs," which is reproduced in full in the margin.[1] It constitutes a succinct but

---

* Honorable Otto R. Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

1. This division of the general ordinance reads in full as follows:

DIVISION 6. TEMPORARY SIGNS
Sec. 3.133. Erection regulated.
Temporary signs may be erected in addition to all other signs permitted by this article without complying with the provisions of subdivision II of division 3 of this article if they comply with the provisions of this division. (Ord. No. 1983, art. 8, § 8.1)
Sec. 3.134. Uses.
Temporary signs shall be used solely for the purpose of advertising an event occurring on a specific date, such as elections, theatrical and circus performances and special sales

comprehensive regulatory scheme controlling the use of temporary signs.

Temporary signs are exempt from provisions of the general sign ordinance imposing design and structural controls upon signs (section 3.133). Temporary signs may be used only for advertising an event occurring on a specific date "such as elections" (section 3.134). They may be maintained for no more than 60 days, and must be removed within 10 days after the advertised event (section 3.135). A permit must be obtained for each temporary sign. Every application for a permit must be accompanied by a $1.00 nonrefundable inspection fee and a $5.00 refundable deposit to assure

removal (section 3.136). No temporary sign may exceed 16 square feet (section 3.137(a)). The aggregate area of such signs on any parcel in one ownership may not exceed 80 square feet (*Id.* ). The aggregate area of such signs advertising a single candidate or issue may not exceed 64 square feet (section 3.137(b)). No such sign is permitted on public property (section 3.138). None is permitted in a residentially zoned district of the city (section 3.139). The building inspector may after 24 hours' written notice remove any sign erected in violation of the ordinance, and "without notice, remove any temporary sign which is erected, placed or maintained in violation of this article in any zoning district" (section 3.89).[2]

by retail stores. (Ord. No. 1083, art. 8, § 8.2)
Sec. 3.135. Maximum length of time to be maintained.
Temporary signs shall not be maintained for a period in excess of sixty days, and in no event shall such signs be maintained more than ten days after the happening of the event advertised thereon. (Ord. No. 1083, art. 8, § 8.3)
Sec. 3.136. Permit required to erect; application; inspection fee; cash deposit or bond.
No person shall erect or maintain any temporary sign until a permit therefor has been secured from the building inspector. Applications for a temporary sign permit shall be made on forms provided by the building inspector and shall be accompanied by a nonrefundable inspection fee of one dollar for each sign.
Every application for a temporary sign shall be accompanied by a cash deposit of five dollars for each temporary sign proposed to be erected to assure removal of such signs in accordance with the provisions of section 3.135. On the failure to remove the signs as required by section 3.135, the deposit shall be forfeited to the city; otherwise, the building inspector shall cause the deposit to be refunded. In lieu of a cash deposit, the building inspector may accept a bond, executed by a corporate surety authorized to do business in the state and conditioned upon removal of the temporary signs in compliance with the provisions of section 3.135. (Ord. No. 1083, art. 8, § 8.4)
Sec. 3.137. Maximum area.
(a) No temporary sign shall exceed sixteen square feet in area. The aggregate area of all temporary signs placed or maintained on any parcel of real property in one ownership shall not exceed eighty square feet.
(b) The aggregate area of all temporary signs placed or maintained within the city advertising a single event or, in the event of an election, for any candidate or ballot issue,

shall not exceed sixty-four square feet. (Ord. No. 1083, art. 8, § 8.5; Ord. No. 1304, § 18)
Sec. 3.138. *Placement on public property.*
No temporary sign shall be permitted on or to extend over any public property; provided, however, that the building inspector may issue a permit for the erection or maintenance of banners, flags, bunting and similar devices over any public right of way if he finds that such device is to be maintained in connection with an event of a general civil and public nature conducted within the city. The building inspector may establish conditions on such permit as may be necessary to assure compliance with the purposes of this article. (Ord. No. 1083, art. 8, § 8.6)
Sec. 3.139. *Prohibited in residentially zoned districts.*
No temporary sign shall be placed or maintained in the zoning districts mentioned in section 3.121. (Ord. No. 1083, art. 8, § 8.7)

2. Section 3.89 provides:
All signs, including signs installed prior to the adoption of this article, shall be constantly maintained in a state of security, safety and good repair. If the building inspector finds that any sign is unsafe or insecure, is a menace to the public safety or has been constructed, erected, relocated or altered after *the effective date of this article in violation of* the provisions hereof, he shall give written notice to the owner or the tenant of the property wherein it is located to remove or alter such sign. If the owner or tenant fails to comply with the provisions of this article within ten days after such notice, the building inspector may cause such sign to be removed, and the cost thereof shall be paid by the owner or tenant. The building inspector may cause any sign which is an immediate peril to persons or property to be removed *summarily and without notice.*

On cross motions for summary judgment the district court declared unconstitutional the nonrefundable $1.00 inspection fee for each sign, the limitation to 64 square feet of the aggregate area of all signs on behalf of a candidate or ballot proposition, and the ban on placing such signs in residential areas. On subsequent motions for summary judgment the court sustained the requirement of a $5.00 refundable deposit per sign and the provision for summary removal of signs placed in violation of the ordinance. After trial, the court also sustained the requirement that a permit be obtained for each temporary sign, the limitation of the area of each sign to 16 square feet, and the limitation of the aggregate area of all signs on a single parcel of property to 80 square feet. Both sides appeal.[3]

## I

There are two preliminary matters.

■ A. On July 8, 1975, the district court entered an order granting a motion for summary judgment upholding certain of the challenged provisions. Issues relating to the constitutionality of other provisions were tried to the court. Final judgment was entered on July 30, 1975. The notice of appeal filed by Baldwin and Cannon states that the appeal is "from the judgment entered in this action on July 30, 1975 . . . ." Redwood City officials argue that Baldwin and Cannon waived their right to appeal the July 8 order because that order was not expressly incorporated in the final judgment, and Baldwin and Cannon did not file a separate notice of appeal within 30 days of the "final" order of July 8 as required by Federal Rule of Appellate Procedure 4(a). We disagree. The order of July 8 denied Baldwin and Cannon's prayer for injunctive relief as to provisions sustained by the order. Although the order was interlocutory, it was nevertheless appealable.[4] Baldwin and Cannon lost their right to an interlocutory appeal from the July 8 order because they did not file a notice of appeal within 30 days.[5] But an interlocutory appeal is permissive, not mandatory. When an appeal is not taken, the interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment.[6]

■ B. The complaint alleged that Baldwin and Cannon were supporters of Melvin Kerwin, candidate for the Redwood City Council in the 1974 election, and were prevented by the challenged ordinance from erecting signs of the size and at the locations they desired in support of Kerwin's candidacy. The election has been held. Kerwin was defeated and, allegedly, will not run again. Redwood City officials ar-

---

Notwithstanding the foregoing, the building inspector may remove any sign erected, placed or maintained in violation of this article if the owner of the property on which the sign is erected fails to remove such sign after 24 hours written notice to do so. In addition, the building inspector may summarily, without notice, remove any temporary sign which is erected, placed or maintained in violation of this article in any zoning district. (Ord. No. 1083, art. 3, § 3.5; Ord. No. 1140, § 2; Ord. No. 1304, § 3)

3. The district court dismissed the action as to Redwood City on the ground that a municipal corporation is not a "person" within the meaning of 42 U.S.C. § 1983. Baldwin and Cannon do not challenge this ruling. See City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Remaining as defendants were Paul C. Keckley and Charles Gyselbrecht, who were sued in their official capacity of Mayor and Building Official of Redwood City, respectively.

Apparently Mr. Keckley is no longer Mayor of Redwood City. Rule 25(d) of the Federal Rules of Civil Procedure provides for automatic substitution of his successor as a party. Substitution is appropriate since it was admitted and the district court found that occupants of the office had enforced and would continue to enforce the temporary sign regulations.

4. 28 U.S.C. § 1292(a)(1). See EEOC v. International Longshoremen's Ass'n, 511 F.2d 273, 276 (5th Cir. 1975); Abercrombie & Fitch Co. v. Hunting World, Inc., 461 F.2d 1040, 1041 (2d Cir. 1972).

5. George v. Victor Talking Mach. Co., 293 U.S. 377, 378–79, 55 S.Ct. 229, 79 L.Ed. 439 (1934); Bowles v. Rice, 152 F.2d 543, 544 (6th Cir. 1946).

6. Adamian v. Jacobsen, 523 F.2d 929, 931 (9th Cir. 1975); 9 Moore's Federal Practice ¶ 110.18 (1975 ed.).

gue that the case is moot, relying upon *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). *Zwickler* challenged a state statute barring distribution of anonymous literature in an election campaign. Not only had the election been held, but *Zwickler*'s opposition was directed solely against a particular congressman, who had since been appointed to a 14-year term as a state supreme court justice. It was therefore "most unlikely" that he would be a candidate again. On these facts, the Supreme Court concluded that an "actual controversy" of sufficient "immediacy and reality" to warrant issuance of a declaratory judgment was lacking.

This case is different. Baldwin testified that he was engaged actively in politics in the Redwood City area for nearly 20 years. He has participated, and made use of political signs, in both partisan and nonpartisan elections, including elections for the Redwood City Council and the board of Redwood City high school. He has supported candidates other than Melvin Kerwin—indeed, has been a candidate himself. He testified that there would be future occasions in which he would want to use such political posters in a manner prohibited by the challenged provisions. The district court found that Redwood City officials would continue to enforce the challenged provisions against Cannon or other persons wishing to erect political campaign posters in future municipal elections. Thus, the record established Baldwin's continuing interest in local political campaigns involving the use of such signs and a continuing determination on the part of Redwood City

officials to enforce the ordinances. On these facts, a future confrontation is likely; an immediate and real controversy exists. Moreover, given the frequency and brevity of local political campaigns and the length of time required to complete judicial proceedings, the issue is one "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).[7] These appeals are not moot.

II

Before considering the district court's rulings on each of the challenged provisions, we state our understanding of the tests to be applied.

■ Both the parties and the district court rely upon concepts drawn from cases involving challenges to state and local statutes under the Equal Protection Clause. The Supreme Court has employed a different analysis in evaluating governmental restrictions on free speech. In First Amendment cases involving statutes similar to Redwood City's temporary sign regulations, the Court's approach has been one of balancing rather than classifying.[8] The following general rule may be drawn from decisions in which state and municipal enactments have been weighed against the First Amendment: Incidental restrictions upon the exercise of the First Amendment rights may be imposed in furtherance of a legitimate governmental interest if that interest is unrelated to suppression of expression and is substantial in relation to the restrictions imposed, and if the restrictions are no greater than necessary or essential to the protection of the governmental interests.[9]

7. *See Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and cases there cited; *Webster v. Mesa,* 521 F.2d 442, 443 (9th Cir. 1975). The "capable of repetition, yet evading review" doctrine provides an independent ground for holding this case not to be moot. Thus, even though most of the evidence of a continuing interest in Redwood City politics was provided by Baldwin, we will decide the issues raised by both plaintiffs. *See Rosario v. Rockefeller,* 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

8. For recent examples of explicit use of a First Amendment balancing test by the Supreme

Court, *see Erznoznik v. Jacksonville,* 422 U.S. 205, 208, 95 S.Ct. 2016, 44 L.Ed.2d 643 (1975); *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Pell v. Procunier,* 417 U.S. 817, 824, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

9. *See Young v. American Mini Theatres, Inc.,* —— U.S. ——, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976) (Powell, J., concurring); *Procunier v. Martinez,* 416 U.S. 396, 409–15, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *A Quaker Action Group v.*

■ Significant First Amendment interests are involved in this case. Communication by signs and posters is virtually pure speech.[10] The element of conduct in a sign posted on behalf of an issue or candidate during a campaign is minimal. Baldwin and Cannon seek to use posters in political campaigning, and "the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971).[11] Posters and signs are erected adjacent to "traditional first amendment forums, such as public sidewalks and other thoroughfares," *Aiona v. Pai,* 516 F.2d 892, 893 (9th Cir. 1975)[12] where "expressive activity may be restricted only for weighty reasons." *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).[13] Redwood City's regulations inhibit the use of political signs in two principal ways: the permit and fee requirements make it diffi-

cult to post signs[14]; and various other restrictions on their face limit the quantity, size, and placement of signs. The regulations thus directly infringe the First Amendment rights of individuals who want to express political opinion in a traditional First Amendment forum.

The governmental interests relied upon to support the challenged regulations are public safety, order, and cleanliness; aesthetics and the quality of community life; administrative convenience; and equalization of opportunity among political candidates. The latter interest looks to the content of the communication, and thus involves suppression of communication.[15] The remaining interests are unrelated to suppression of free expression, and are legitimate concerns of government. Obviously they vary greatly in importance, both as general objects of government and as justifications for the particular regulations involved here. The relative significance of

Morton, 170 U.S.App.D.C. 124, 516 F.2d 717, 725 (1975).

**10.** *Karp v. Becken,* 477 F.2d 171, 176 (9th Cir. 1973). *See Ross v. Goshi,* 351 F.Supp. 949, 953 (D.Hawaii 1973); *Dulaney v. Municipal Court,* 11 Cal.3d 77, 83–84, 112 Cal.Rptr. 777, 781–82, 520 P.2d 1, 5–6 (1974). The significance of this fact is that the extent of permissible regulation significantly increases as the mode of expression moves from pure speech to speech combined with conduct. *California v. LaRue,* 409 U.S. 109, 117, 93 S.Ct. 390, 34 L.Ed.2d 342 (1973).

**11.** *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976).

**12.** *See Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The government's power to restrict expression is not enhanced by the fact that signs are posted on private rather than public property. *Cf. Stone,* Fora Americana: Speech in Public Places, 1974 Sup.Ct.Rev. 233, 256–58.

**13.** *See Lloyd Corp. v. Tanner,* 407 U.S. 551, 559, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *cf. Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–03, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). In *Lehman,* the Court upheld a ban on political advertisements in municipally owned street cars after determining that the city's policies on access to the transit advertising space were not "arbitrary, capricious or invidious." The Court explained its use of this le-

nient standard of review by stating, "[h]ere, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce." *Id.* at 303, 94 S.Ct. at 2717. The Court concluded "[n]o First Amendment forum is here to be found." *Id.* at 304, 94 S.Ct. at 2718.

**14.** Two candidates in a San Mateo Community College District Governing Board election filed uncontradicted affidavits stating that the Redwood City temporary sign regulations had hampered their efforts to mount a vigorous political sign campaign. One stated that an investigation of Redwood City's requirements for political signs led to the conclusion that they are "cumbersome, expensive and inhibiting." The second candidate asserted "that the permit procedure in Redwood City was so difficult, complicated, expensive and restrictive as to virtually prohibit the use of political signs by my supporters in that city." The affidavits submitted by Redwood City officials did not contradict this showing that Redwood City regulations are so burdensome as to prevent extensive use of political signs. They simply asserted that posters erected in commercial districts are seen by most Redwood City residents and that effective alternatives to political posters are available.

**15.** *Cf. Buckley v. Valeo,* 424 U.S. 1, 96. S.Ct. 612, 634, 46 L.Ed.2d 659 (1976).

these interests, and the importance of the challenged regulations to their realization must be considered in determining the validity of the particular regulations. In such a case as this

> the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.

*Schneider v. State,* 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).[16]

█ Careful consideration must also be given to whether the challenged regulation is either more inclusive or more burdensome than necessary to further legitimate governmental purposes. "[I]n the First Amendment area 'government may regulate . . . only with narrow specificity.'" *Hynes v. Mayor and Council of Borough of Oradell,* —— U.S. ——, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976), *quoting NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). In addition, the regulation must be the least restrictive means available that would accomplish the legislative purpose. "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. . . . If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes,* 414 U.S. 51,

58–59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973) (citations omitted).[17] "The question in this case is not whether some support for the regulations may be adduced, by reference to evidence in the record and a claim of reasonable inferences or concerns, but is whether the regulations at issue here are 'unnecessarily restrictive for the purpose they were designed to serve.'" *A Quaker Action Group v. Morton,* 170 U.S.App. D.C. 124, 516 F.2d 717, 723–24 (1975), *quoting A Quaker Action Group v. Morton,* 148 U.S. App.D.C. 346, 460 F.2d 854, 860 (1971).[18]

The Redwood City officials rely heavily upon decisions sustaining municipal restrictions upon door-to-door canvassing and use of sound trucks. These modes of expression involve intrusions upon privacy significantly more egregious and difficult to avoid than posters. Decisions sustaining regulation of canvassing and soliciting rest in part upon the importance of protecting "the householder's right-to-be-let-alone." *Hynes v. Mayor and Council of Borough of Oradell, supra,* 96 S.Ct. at 1760. Similar considerations support the validity of regulations prohibiting sound trucks emitting "loud and raucous noises." "The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality." *Kovacs v. Cooper,* 336 U.S. 77, 86–87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949).[19] Posters, on the other hand, do not invade the home. They can be avoided simply by not looking. As the Court noted

---

**16.** After reviewing the relevant cases, one commentator concluded that the Supreme Court uses the most rigorous version of its First Amendment balancing test "for relatively familiar or traditional means of expression, such as pamphlets, pickets, public speeches and rallies . . . ."—a category that includes political posters and signs. Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv.L.Rev. 1482, 1488 (1975).

**17.** *See Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Unit-*

ed *States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

**18.** For application of these principles to sign ordinances, see *Farrell v. Township of Teaneck,* 126 N.J.Super. 460, 315 A.2d 424 (1974); *Peltz v. City of South Euclid,* 11 Ohio St.2d 128, 228 N.E.2d 320 (1967).

**19.** For cases striking down regulations of loud speakers, see *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Wollam v. City of Palm Springs,* 59 Cal.2d 276, 29 Cal. Rptr. 1, 379 P.2d 481 (1963).

in *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), "[m]uch that we encounter offends our esthetic, if not our political and moral, sensibilities," but "the burden normally falls upon the viewer to 'avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" *Id.* at 210–11, 95 S.Ct. at 2273, *quoting Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

■ It is true, as the city officials argue, that means other than posters are available for communication between candidates and the community. The existence of such alternatives is not alone enough to justify any regulation the city may desire to impose upon this means of expression.[20] It is, however, a factor to be considered in striking the appropriate accommodation between free speech and legitimate governmental interests.[21] Its significance depends upon the nature of the First Amendment interest involved in the particular case, the purpose and the extent of the restriction imposed, and the availability of less restrictive means of accomplishing the legitimate governmental objective. As we have said, the First Amendment interests involved in the display of political posters adjacent to public thoroughfares are substantial. Moreover, means of political communication are not entirely fungible; political posters have unique advantages. Their use may be localized to a degree that radio and newspaper advertising may not. With exception of handbills, they are the least expensive means by which a candidate may achieve name recognition among voters in a local election.[22]

### III

Baldwin and Cannon have not attacked the entire regulatory scheme. We refrain from considering the validity of particular aspects of the scheme not challenged. These include, among others, the restriction of the period during which "temporary signs" may be displayed.

The requirements challenged by Baldwin and Cannon are of three kinds. The first are preconditions to the erection of temporary signs: a permit application must be filled out, a $1.00 inspection fee must be paid, and a $5.00 refundable deposit must be made. The second group includes limitations on the use, placement, and size of political signs: the aggregate area of signs per candidate or ballot issue is limited to 64 square feet, individual signs are limited to 16 square feet, the aggregate area of signs per parcel of property is limited to 80 square feet, and no signs are permitted in residential areas. Finally, Baldwin and Cannon challenge the provision authorizing summary removal of signs placed in violation of the other regulations.

We first consider the limitation on the maximum size of individual signs and upon the aggregate area of signs because the conclusion we reach as to the validity of these provisions affects the validity of others.

■ We have no difficulty agreeing with the district court that the limitations of individual signs to a maximum area of 16 square feet and the aggregate area of signs on a single parcel to 80 square feet do not offend the First Amendment.

---

**20.** *A Quaker Action Group v. Morton,* 170 U.S. App.D.C. 124, 516 F.2d 717, 733 n. 49(a) (1975); *see Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**21.** *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 634 n. 17, 46 L.Ed.2d 659 (1976); *Pell v. Procunier,* 417 U.S. 817, 824–25, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Breard v. Alexandria,* 341 U.S. 622, 631–32, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); *Kovacs v. Cooper,* 336 U.S. 77, 89, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Cox v. New Hampshire,* 312 U.S. 569, 575, 61 S.Ct. 762, 85

L.Ed. 1049 (1941). *See also Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

**22.** *Cf. Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Martin v. City of Struthers,* 319 U.S. 141, 145–47, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Van Nuys Publishing Co. v. City of Thousand Oaks,* 5 Cal.3d 817, 823–24, 97 Cal.Rptr. 777, 781, 489 P.2d 809, 813 (1971); *Stone, supra* note 12, at 256–57.

Neither limitation significantly deters the exercise of First Amendment rights; they are comparable to the decibel restriction on sound trucks upheld in *Kovacs v. Cooper, supra.* Neither is related in any way to the content of the posters. Their effect upon the quantity of expression is remote. Larger signs may be erected by complying with structural and design requirements applicable to other than temporary signs; and there is nothing in the record to suggest that the numbers of parcels in separate ownership in Redwood City is so limited that the 80 square foot per parcel limit imposes any significant restriction on the total exposure a candidate can obtain. Baldwin himself testified that he used signs slightly smaller than 16 square feet in the Kerwin campaign in 1974 and was satisfied with the size; he also testified that although he had placed more than 80 square feet of signs on a piece of property on occasion, it was improbable that he would want to do so often.

Both limitations contribute to the appearance of the community and further other legitimate municipal interests. "Temporary signs" are not required to meet design and structural requirements. The 16 square feet limitation on such signs is based upon Redwood City's experience with the effects of the elements, particularly the wind, upon unreinforced signs of various sizes. This legitimate interest might be served as well by slightly less restrictive size limitations, but "[s]uch distinctions in degree become significant only when they can be said to amount to differences in kind." *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 640, 46 L.Ed.2d 659 (1976). The city officials justify the aggregate sign area limitation of 80 square feet per lot as reducing accumulation of debris and minimizing traffic hazard. The relationship of the restriction to these interests is attenuated and the unavailability of less restrictive alternatives questionable, but the burden imposed on free speech by this restriction is so minimal that generous allowance may be made for municipal preferences.

■ The district court also was clearly correct in holding unconstitutional the limitation of the aggregate area of posters on behalf of a single candidate or issue. Because the restriction is keyed to a particular candidate or issue, it rests upon the message conveyed by the posters. It severely restricts the extent to which supporters of a particular candidate or issue may communicate with the voters through this medium. Only four posters of the modest size of 16 square feet may be posted "for any candidate or ballot issue" in the whole of Redwood City—an area of more than 20 square miles with a population in excess of 55,000. Most important, like the limitations on campaign expenditures held unconstitutional in *Buckley v. Valeo, supra,* Redwood City's limitation on the aggregate area of posters that may be erected in support of any candidate or issue "restrict[s] the quantity of campaign speech by individuals, groups, and candidates," and therefore "limit[s] political expression 'at the core of our electoral process and of the First Amendment freedoms.'" *Id.* at 644, *quoting Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Such a restriction can be upheld only if "the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core of First Amendment rights of political expression." *Buckley v. Valeo, supra,* 96 S.Ct. at 647.[23]

■ One of the asserted objectives of the aggregate size limitation is to equalize the political opportunities of poorer candi-

**23.** A dollar ceiling on campaign expenditures restricts the use of virtually all means of communication. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 634 n. 17, 46 L.Ed.2d 659 (1976). The limitations imposed by Redwood City on *temporary* signs, on the other hand, do not affect the use of handbills, newspapers, radio, or television. As suggested earlier, however, posters are a unique form of political communication for which, in many situations, there may be no adequate substitute. Moreover, as the Court also noted, *id.,* there is a vital difference between regulating the manner in which a *mode* of communication is employed (limiting the decibels emitted by a sound truck, for example), and regulating the *extent* of the proper use of a mode of communication.

dates by limiting the number of posters that may be erected by those who are better financed. "But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment. . . ." *Id.* at 649.

No substantial privacy interest is involved. To a large extent the intrusion may be avoided at the will of the observer.

Any relationship between the aggregate area of temporary signs and traffic safety is far too imprecise to justify the restriction as a traffic regulation. The availability of less restrictive means is demonstrated by another ordinance specifically prohibiting the erection of signs that may obstruct the vision of drivers or interfere with traffic.[24] City officials suggest that this provision deals only with obstruction, and that posters may also be distracting. Considering the universe of distractions that face motorists on our city streets, temporary political posters are not sufficiently significant to justify so serious a restriction upon political expression.

Much the same analysis applies to the city's legitimate interest in the cleanliness and good order of its streets. There are alternate means of accomplishing this end that are substantially less restrictive of freedom of expression. Redwood City can and does impose an obligation upon owners or tenants of property to remove or alter unsafe or insecure signs.[25] Redwood City also requires that those who post temporary signs to remove them no later than 10 days after the advertised event. If these measures are not wholly successful, the minimal burden of removing the residual litter is a price of free expression the city must bear.[26]

The remaining interest advanced in support of the limitation to 64 square feet of the aggregate area of posters erected in Redwood City is aesthetics—the preservation of Redwood City as an attractive place to live and work. We do not dispute the importance of this interest.[27] However, temporary signs are used primarily in connection with elections, which occur relatively infrequently, and the city has further diminished the problem by limiting the period during which a temporary sign may be displayed to 60 days and requiring removal 10 days after the election. Moreover, it is not beyond the power of the city to impose design restrictions that would bar the more unsightly posters, without impairing political expression. The margin of offensiveness to the taste of some that cannot be avoided by these less restrictive alternatives already used or available to the city does not justify the virtual ban upon political posters imposed by the 64 square foot limitation.[28]

The invalidity of the 64 square foot limitation affects the burdensomeness, and hence the constitutionality, of the preconditions Redwood City imposes upon erection of temporary signs: filing an application,

---

**24.** Section 3.87 of Article II of the Redwood City Code provides: "No sign shall be erected so as to obstruct the vision of vehicular traffic or at any location where it may interfere with, or be confused with, any traffic signal or device."

**25.** *See* note 2.

**26.** *Cf. Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**27.** *Young v. American Mini Theatres, Inc.,* —— U.S. ——, 96 S.Ct. 2440, 2452–53, 49 L.Ed.2d 310 (1976); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 5–6, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

**28.** *Accord Ross v. Goshi,* 351 F.Supp. 949 (D.Hawaii 1972); *Peltz v. City of South Euclid,* 11 Ohio St.2d 128, 228 N.E.2d 320 (1967). The regulations held invalid in these cases prohibited political signs entirely. Redwood City officials argue that only total prohibition, as distinguished from regulation, of a mode of expression offends the First Amendment. The distinction is artificial. In a sense, "[a]ll regulatory legislation is prohibitory." *Breard v. Alexandria,* 341 U.S. 622, 631, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). The question is whether, on balance, a regulation of either kind unduly restricts First Amendment rights.

paying a $1.00 inspection fee, and depositing a $5.00 removal charge, for each sign. Applied to four 16-square-foot signs, the burden of compliance may be inconsequential. Applied to the number of political posters that would normally be used in supporting a candidate or issue in a community the size of Redwood City, the burden is so great as to inhibit the use of this means of communication. Moreover, each of the three requirements, when examined in light of its purpose, is unnecessarily burdensome and contains an element of arbitrariness.

■ A single application form is used for all signs; there is no separate application for temporary signs alone. The form calls for detailed information which appears burdensome to obtain. It is conceded that most of this information is irrelevant to temporary signs.[29] Indeed, city officials testified they do not require that this information be furnished to obtain a permit for a temporary sign, and applicants who appear in person to apply for such signs are so advised. But the form is also mailed to those who call or write; it may be completed and returned by mail; and it is headed "only complete application accepted."[30]

■ The city officials offered evidence that the average cost of inspection is $10.00 per sign, including administrative expenses and the salaries of inspectors and office personnel. The cost of inspection must vary greatly depending upon the circumstances. The only aspect of a temporary sign subject to inspection at the outset is its size, which can be verified in a few moments with a tape measure. A $1.00 fee for checking the size of a single poster might be reasonable; but, as the district court held, a $500 fee for inspecting 500 identical political posters would be essentially arbitrary, bearing no relationship to the cost. The absence of apportionment suggests that the fee is not in fact reimbursement for the cost of inspection but an unconstitutional tax upon the exercise of First Amendment rights.[31]

29. The form states, for example:
 Each application for a Sign Permit must be accompanied with duplicate copies of the following information:
 1. A Plot Plan showing the position of the sign and its relation to structures and other signs on the property.
 2. Plans and Specifications for the sign and showing the method of attachment or anchorage.
 3. Stress sheets and calculations prepared by a Civil or Structural Engineer, licensed as such by the State of California, when required.
 4. . . . .
 Another portion of the form requires the applicant to provide the fire zone, the lot frontage, the area of existing signs, the area of the proposed sign, the maximum height and width of the sign, the "clearance to grade," the maximum projection beyond the face of the building or the street property line, and the vertical and horizontal clearance from overhead electric lines.

30. The form requires the applicant to certify that he has obtained the written consent of the owner of the property on which the sign is to be posted. Baldwin and Cannon do not object to the requirement of consent, but argue that the further requirement that the consent be written is unduly burdensome. City officials testified that individuals filing permit applications were required to certify that they had obtained written consent, but were not required to produce the written consents. The written consent requirement imposes a substantial additional burden, particularly where it is desirable to employ a large number of small posters, as is commonly the case in political campaigns. The practice followed by Redwood City of not requiring that the written consents be produced indicates that its interest is adequately served by a statement that the applicant has the property owner's consent. Whatever benefit may accrue to the city from the requirement that the applicant certify that the consent is in written rather than oral form is insufficient to justify the heavy additional burdens imposed on the exercise of First Amendment rights.

31. *Follett v. Town of McCormick,* 321 U.S. 573, 575, 576–77, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *cf. Strasser v. Doorley,* 432 F.2d 567, 569 (1st Cir. 1970). *But see United States Labor Party v. Codd,* 527 F.2d 118, 119 (2d Cir. 1975).
 The charge sustained in *Cox v. New Hampshire,* 312 U.S. 569, 576–77, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), was apportioned.
 The fee required to be submitted with an application for a permit for other than a temporary sign varies with the valuation of the sign, including cost of installation. Redwood City Code § 3.82.

According to city officials, the average cost of removal is $25.00 per sign. But again, a $5.00 removal deposit has no reasonable relationship to the cost of removing a single 50 cent political poster placed by a property owner in his front yard, and the charge is so disproportionately burdensome as to inhibit such an expression of political opinion. The deposit is returned if the sign is removed, but money is most useful during a campaign. Requiring the commitment for the duration of the campaign of $5.00 in cash, or surety, for each poster erected would, as a practical matter, preclude erection of all but a few large signs. Means less restrictive of free expression must be relied upon to serve the interests of community tidiness and aesthetics.

In some circumstances a city may both require a permit for activity involving free expression without violating the First Amendment[32] and also collect fees that fairly reflect costs incurred by the city in connection with such activity.[33] We affirm the district court's holding that Redwood City's inspection fees are invalid, and extend this holding to the removal deposit and the permit system because the particular regulations adopted by Redwood City are unnecessarily burdensome and arbitrary in light of the interests such regulations may properly serve.

The district court invalidated the exclusion of temporary signs from residential zones in Redwood City because this provision constitutes a "total prohibition."[34] There is Supreme Court language suggesting that a form of free expression may not be barred entirely from an area in which exercise of the right of free speech has been traditional.[35] In any event, such a regulation, like any other governmental interference with free speech, may be sustained only if it is no more restrictive than necessary to further significant government interests.

**32.** See, e. g., Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); A Quaker Action Group v. Morton, 170 U.S.App. D.C. 124, 516 F.2d 717, 726–27 (1975).

Both Cox and Quaker Action considered requirements of permits for parades or organized demonstrations. The Court's opinion in Cox suggests that the regulatory problems posed by political signs and posters are of a much lower magnitude than those presented by parades and demonstrations. In Cox, the Court noted that the state supreme court had
thought it significant that the statute prescribed "no measures for controlling or suppressing the publication on the highways of facts and opinions, either by speech or by writing"; that communication "by the distribution of literature or by the display of placards and signs" was in no respect regulated by the statute; that the regulation with respect to parades and processions was applicable only "to organized formations of persons using the highways"; and that "the defendants, separately, or collectively in groups not constituting a parade or procession," were "under no contemplation of the act."
Cox v. New Hampshire, supra, 312 U.S. at 575, 61 S.Ct. at 765. The Court also observed that the New Hampshire Supreme Court had noted that requiring application for a permit gave public authorities the advance notice necessary for proper policing of a parade or demonstration. Further, the state supreme court had observed that by fixing time and place, "the license served 'to prevent confusion by overlapping parades or processions, to secure convenient use of the streets by other travelers, and to minimize the risk of disorder.'" Id. at 576, 61 S.Ct. at 766. Political signs neither interfere with use of the streets nor create a risk of disorder.

**33.** Murdock v. Pennsylvania, 319 U.S. 105, 113–14, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Cox v. New Hampshire, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

**34.** The Redwood City temporary sign regulations permit political signs in residential areas, if the signs are placed inside a house three feet back from a window. The district court apparently concluded that allowing signs only if they are inside a house and three feet back from windows is equivalent to not allowing signs at all. We agree.

**35.** In Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the Supreme Court flatly stated that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Id. at 163, 60 S.Ct. at 151. This statement was quoted with approval in Grayned v. City of Rockford, 408 U.S. 104, 118–19 n. 40, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The city officials argue that the exclusion of political signs from residential areas does not have a substantially adverse impact on candidates because residents are exposed to such signs as they pass through commercial areas of the city. This ignores the right of residents to express their own views. Of the two plaintiffs, apparently only Cannon owned commercial property in Redwood City. Baldwin desired to erect a poster in support of the Kerwin candidacy in his own front yard. He was prevented from doing so by the challenged ordinance.[36]

City officials advance two municipal interests in support of the ban. They argue that "indiscriminate use of political signs in such suburban residential areas is entirely out of place with the zoning and planning character of the community." They add that "such signs become much greater traffic hazards in such areas by virtue of narrower street systems, street trees, and sight distances at intersections." But Redwood City has not attempted to regulate "indiscriminate use" of political signs in residential areas or signs which create traffic hazards. Instead, the city has completely barred use of such signs in such areas. As we have noted in considering the 64 square foot aggregate area limitation, less restrictive means are available to deal with litter, ugliness, and traffic hazards. For these reasons, the only state supreme court that

has considered the problem has concluded that total exclusion of political posters from residential areas is invalid.[37] We agree.[38]

 Baldwin and Cannon challenge the last paragraph of section 3.89 of the Redwood City Code on the ground that it violates due process by permitting summary seizure where there is no imminent danger to persons or property.[39] The city officials answer that the summary seizure provision is used only against signs that are "essentially abandoned." But the provision on its face allows city officials to remove signs summarily if in their opinion there is a violation of the sign regulations. There is no evidence that summary removal is in fact employed only when signs are abandoned or hazardous. On the contrary, evidence was offered that signs supporting the Kerwin candidacy were seized during the campaign because they violated the ordinance. Such seizures appear to be contemplated by section 3.89. The final sentence of section 3.89's first paragraph permits summary removal of "any sign which is an immediate peril to persons or property . . . ." Thus, unless the final sentence of the section's second paragraph, challenged here, is superfluous, it must have been intended to allow summary removal in situations where there is no immediate threat of harm.

**36.** For this reason city officials were not harmed by the failure of the court to receive additional evidence bearing on the adequacy of the exposure resulting from signs erected in commercial areas.

**37.** *Pace v. Village of Walton Hills,* 15 Ohio St.2d 51, 238 N.E.2d 542 (1968); *see Farrell v. Township of Teaneck,* 126 N.J.Super. 460, 315 A.2d 424 (1974). *See also Ross v. Goshi,* 351 F.Supp. 949 (D.Hawaii 1972); *Peltz v. City of South Euclid,* 11 Ohio St.2d 128, 228 N.E.2d 320 (1967). Two lower court decisions in New York are to the contrary. *Gibbons v. O'Reilly,* 44 Misc.2d 353, 253 N.Y.S.2d 731 (Sup.Ct. 1964); *Town of Huntington v. Estate of Schwartz,* 63 Misc.2d 836, 313 N.Y.S.2d 918 (Dist.Ct.1970). Both cases are criticized in Note, Architecture, Aesthetic Zoning, and the First Amendment, 28 Stan.L.Rev. 179, 195 nn. 81–82 (1975).

**38.** The Supreme Court's recent decision in *Young v. American Mini Theatres, Inc.,* ——

U.S. ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), is not to the contrary. The plurality goes no farther than to assert that "*commercial* exploitation of material protected by the First Amendment is subject to zoning or other licensing requirements." *Id.* at 2448 (emphasis added). Mr. Justice Powell, concurring, applies the balancing test announced in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), including the requirement that "the incidental restriction on . . . First Amendment freedoms is no greater than is essential to the furtherance" of "an important or substantial governmental interest." *Young v. American Mini Theatres, Inc., supra,* 96 S.Ct. at 2456. Our holding that the exclusion of political posters from residential areas is invalid rests upon application of this same test.

**39.** *See* note 2.

The summary seizure of a political sign for even a few days can deprive the sign's owner of an important First Amendment liberty interest. During a campaign, time is especially valuable. In the area of regulation of obscenity and censorship of movies, the Supreme Court has held that the Due Process guarantee prevents the erosion of First Amendment liberties by procedures which sweep broadly and with too little discrimination.[40] The Court recently stated that its "[i]nsistence on rigorous procedural safeguards" for an administrative board assigned to screen stage productions is " 'but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks.' " *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 561, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975), *quoting Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The protection of political speech on signs and posters certainly is no less important than the protection of the cinema from the censor.[41] The unlimited power of removal conferred on city officials by the last sentence of section 3.89 is unconstitutional because it does not attempt to accommodate the city's interest in removing improperly placed signs with First Amendment rights.[42]

To be sure, the precise nature of adequate safeguards against suppression of protected speech in motion picture licensing or censoring will differ from the safeguards appropriate for the removal of political signs. The question of whether a film is obscene will usually be more difficult and more subjective than the question of whether a sign violates a valid ordinance. Thus, we do not hold that a prior adversary hearing and expedited judicial review are necessary to prevent the improper removal of political signs. If a city official believes that a sign posted on private property is illegal and there is no threat of immediate harm, he should attempt to notify the sign's owner. If the owner of an allegedly illegal sign cannot be found within a reasonable time, the sign may be deemed to be abandoned. In fact, the Redwood City Building official stated in an affidavit that summary removal is necessary only in dealing with abandoned signs because "there is no practicable method of obtaining knowledge as the ownership of said signs, or the party responsible for placing the same on such property." The final sentence of section 3.89, however, grants a much broader power of removal than necessary to deal with abandoned signs. If the owner of an allegedly illegal sign can be located, the interests at stake may be reasonably accommodated if the city official gives notice of his intention to remove the sign with a brief statement of the official's reason for believing the sign is illegal so the owner may make an informal response or correct the problem.

█ The remainder of section 3.89 is not at issue. Our ruling does not prevent Redwood City from summarily removing signs that remained posted after the post-election

---

**40.** *See, e. g., Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Marcus v. Search Warrant,* 367 U.S. 717, 731–32, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). *See generally Board of Regents v. Roth,* 408 U.S. 564, 575 n. 14, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**41.** *Cf. United States v. Schiavo,* 504 F.2d 1, 13–14 (3d Cir. 1974) (in banc) (Adams, J., concurring); *Slate v. McFetridge,* 484 F.2d 1169, 1176 (7th Cir. 1973).

**42.** Redwood City's provision for summary removal of signs would also be unconstitutional if judged under the Supreme Court's decisions on summary seizure of property. Of course, the property interest of the owners of most political signs is not very significant. Never-

theless, those decisions seem relevant because it is reasonable to assume that free speech interests deserve at least as much protection as property interests. *Cf. States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146, 1154 (4th Cir. 1974). The last sentence of § 3.89 would be invalid under the summary seizure of property cases because it permits summary seizure in other than "extraordinary situations," *Fuentes v. Shevin,* 407 U.S. 67, 90–92, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and with no "accommodation of the conflicting interests of the parties," *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 607, 94 S.Ct. 1895, 1900, 40 L.Ed.2d 406 (1974); *see North Georgia Finishing, Inc. v. Di-Chem,* 419 U.S. 601, 606–07, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

deadline for removal. Such signs may properly be treated as abandoned. In any event, after an election is over, the First Amendment interest in political signs is minimal at most.[43]

We affirm the district court's grant of summary judgment to Baldwin and Cannon, holding the inspection fee, the ban on signs in residential areas, and the limitation of the aggregate area of signs per candidate or ballot issue to be unconstitutional. We reverse the district court's grant of summary judgment to Redwood City officials, holding the refundable deposit requirement and the summary removal provision to be constitutional, and, on remand, the district court is directed to enter summary judgment for Baldwin and Cannon with respect to those two provisions, *see Morgan Guaranty Trust Co. v. Martin,* 466 F.2d 593, 599–600 (7th Cir. 1972); *International Longshoremen's & Warehousemen's Union v. Kuntz,* 334 F.2d 165, 167 (9th Cir. 1964). We reverse the district court's holding that Redwood City's permit requirement is constitutional. We affirm the district court's holding that the limitation on the area of individual signs and the aggregate area of signs per parcel of property are constitutional.

Affirmed in part, reversed in part, and remanded for entry of an injunction consistent with this opinion.

---

43. On the basis of the record, we conclude that the district court's refusal to tax costs in favor of Baldwin and Cannon because their bill of costs was filed three days late was not an abuse of discretion. *Cf. Doran v. United States,* 475 F.2d 742 (1st Cir. 1973); *Dickinson* *Supply Inc. v. Montana-Dakota Utilities Co.,* 423 F.2d 106, 110 (8th Cir. 1970). We therefore do not reach the city official's contention that the court erred in its initial decision that Baldwin and Cannon were entitled to costs.