CANDIDATES' OUTDOOR GRAPHIC SERVICE ... COGS and Richie Roper Wilkinson, Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCIS-CO, and Jeffrey Lee in his capacity as Director of Public Works, Defendants.

No. C–82–5307 WHO.

United States District Court, N.D. California.

March 31, 1983.

Wayne S. Canterbury, Canterbury, Raub & Greenthal, San Francisco, Cal., for plaintiffs.

George P. Agnost, City Atty., Paula Jesson, Deputy City Atty., San Francisco, Cal., for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

This action raises the question whether Section 675 of the San Francisco Municipal Code (Police Code), which regulates the size and placement of signs posted on public property within the City of San Francisco, passes constitutional muster under the First Amendment.[1] This Court holds that it does.

---

1. The complaint charges a violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments

## I

Plaintiffs are a city resident, and Candidates' Outdoor Graphics Service ("COGS"), a California corporation specializing in the design, fabrication, placement, and removal of temporary political signs. The defendants are the City and County of San Francisco ("the City"), and Jeffrey Lee, sued in his capacity as Director of Public Works.

Section 675 makes it unlawful for anyone to post temporary signs on public property, except on lamp posts and utility poles under the following conditions:

1. Only one copy of a single sign may be posted on a single lamp post or utility pole;

2. All corners of the sign must be affixed to the lamp post or utility pole so that the shape of the sign conforms to the shape of the post or pole to which it is attached

and no part may extend or be extended beyond the face of the post or pole;

3. No sign may be longer than eleven (11) inches;[2]

4. No sign may be affixed with glue or any other adhesive substance except tape, nor affixed in a manner that damages any structure or public property;

5. Every sign must contain on it a posting date; and

6. The sign must be removed within thirty days of the posting date.[3]

Plaintiffs challenge only those portions of the ordinance that limit the size of temporary signs to eleven inches in height ("size limitation"), and that require temporary signs to be posted on lamp posts or utility poles, and attached to conform to the shape of the post or pole ("placement

to the United States Constitution, and Article I, Sections 9 and 21 of the Constitution of the State of California.

**2.** The City attorney during oral argument interpreted the term "longer" to refer to the height of a particular sign. The length of a sign apparently is unregulated, but for all practical purposes it is defined by the circumference of the supporting post or pole.

**3.** Section 675(b) reads as follows:

"No person, firm, corporation, committee, partnership or organization, except a duly authorized public officer or employee, shall erect, construct or maintain, paste, paint, print, nail, tack or otherwise fasten or affix, any card, banner, handbill, campaign sign, poster, sign, advertisement, or notice of any kind, or cause or suffer the same to be done, on any curbstone, bench, hydrant, bridge, wall, span wire, tree, sidewalk, or structure in or upon any lawn or other grounds owned or controlled by the City and County of San Francisco, except kiosks designed and maintained for the posting of signs or notices and except as may be required or permitted by ordinance or law. The provisions of this subsection shall not apply to signs placed or maintained upon, or attached to, any lamp post or utility pole provided that the following regulations are adhered to: (1) Only one copy of a single sign may be posted on a single lamp post or utility pole; (2) All corners of the sign shall be affixed to the lamp post or utility pole to so that the shape of the sign conforms to the shape of the lamp post or utility pole to which it is attached and no part

shall extend or be suspended beyond the face of the post or pole; (3) No sign shall be longer than 11 inches; (4) No sign may be affixed with glue or any other adhesive substance except tape, nor affixed in a manner that damages any structure or any public property; (5) Every sign must have placed in the lower right hand corner in a legible manner a date which shall be deemed the posting date and which shall in no event be a date later than the date the sign is posted. As used in this section, a 'utility pole' shall mean a pole which carries or has attached to it a wire or wires used in connection with the Municipal Railway or telephone or electric lines."

Section 675(f) provides further:

"Every person who has posted any sign on any lamp post or utility pole, or who has caused such posting, as permitted by subsection (b) of this section, shall remove such sign within 30 days of the posting date. The Department of Public Works shall remove any sign affixed to any lamp post or utility pole if (1) more than 30 days have elapsed from the posting date contained on the sign; or (2) the sign is not posted in the manner required by subsection (b) of this section; or (3) the sign pertains to a particular event and the date of the event has passed. If the City incurs any expense in removing signs posted on lamp posts and utility poles because they were posted in violation of any of the provisions of subsection (b) or were not removed within 30 days of the posting date, the person responsible for such posting may be billed as provided in Section 677.1 and, if such bill is not paid as required by that section, is subject to payment of a civil penalty as provided by Section 677.-2."

limitation"). The Court express no opinion herein on the remaining provisions of the ordinance.[4]

COGS was retained by the campaign committees of certain political candidates and ballot initiatives to erect temporary political posters around the City in anticipation of the general election held on November 2, 1982. It proposed to post signs of a size and in a manner contrary to the provisions of Section 675. The City informed COGS that it would remove any signs found to be in violation of the ordinance and would impose civil and criminal sanctions on the individuals responsible for posting such signs. COGS filed the instant complaint for declaratory, injunctive, and compensatory relief, together with an application for a temporary restraining order, on September 29, 1982. At a hearing held on September 30, the Court found that the balance of hardships tipped decidedly in favor of the plaintiffs, and issued an order enjoining defendants from enforcing the provisions of Section 675. At a further hearing held on October 22,[5] the Court extended its injunction pending its decision on the merits of plaintiffs' application. For the reasons stated below, the Court finds that the challenged provisions of Section 675 comport with the requirements of the First Amendment, and therefore denies plaintiffs' application for a permanent injunction.

## II

The Court is not without judicial guidance in determining the constitutionality of the challenged limitations. The Ninth Circuit has examined ordinances similar to Section 675 on three occasions. In *Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir.1976), the court sustained certain provisions, and overturned others, of a comprehensive ordinance regulating the posting of temporary signs on private property. The court observed that the approach to be taken in First Amendment cases is one of "balancing" individual and governmental interests, and it articulated the following general rule:

"Incidental restrictions upon the exercise of First Amendment rights may be imposed in furtherance of a legitimate governmental interest if that interest is unrelated to suppression of expression and is substantial in relation to the restrictions imposed, and if the restrictions are no greater than necessary or essential to the protection of the governmental interest."

*Id.* at 1365. Proceeding under this principle, the court found that the provisions of the challenged ordinance limiting individual signs to a maximum area of 16 square feet, and limiting the aggregate area of signs on a single parcel to 80 square feet, passed constitutional muster. *Id.* at 1368. The court observed that both limitations contributed to the city's legitimate concern for the appearance of the community, which concern was based in part on its experience with the effects of the elements, particularly the wind, on unreenforced signs of various sizes. *Id.* at 1369. Especially persuasive to the court was the fact that nei-

---

**4.** Plaintiffs seek by way of relief (in part) a judicial declaration that the entire ordinance is unconstitutional and an injunction forbidding City officials to enforce any of its provisions. Yet, only the size and placement limitations are alleged to be violative of the state and federal Constitutions. *See* complaint ¶ 10. Moreover, in paragraph 13(b) of the complaint, plaintiffs aver "The provision (*sic*) of the ordinance complained of [*not* the entire ordinance] acts generally to reduce to some degree the effectiveness of legitimate sign programs, * * *." Similarly, in their closing memorandum, plaintiffs concede the validity of the removal provisions of the ordinance, but argue "the *challenged portion* of section 675 does not address the question of

removal." Plaintiff's closing memorandum at p. 13 (emphasis added). Plaintiffs do not question in their memoranda the validity of any provisions of the ordinance other than the size and placement provisions. The Court finds therefore that plaintiffs either have not raised proper claims for relief against the remaining provisions of the ordinance, or that they abandoned these claims prior to oral argument.

**5.** At this time, the Court consolidated the hearing on plaintiffs' application for preliminary injunctive relief and the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

ther limitation significantly deterred the exercise of First Amendment rights, and neither was in any way related to the content of the affected signs. *Id.* The size restrictions under consideration were deemed to be comparable to the decibel restriction upheld in *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Because the burden imposed on free expression by the limitations was so minimal, the court indicated that generous allowances could be made for municipal preferences in the means to attain its legitimate governmental interests. *Baldwin, supra,* 540 F.2d at 1369.

One year later in *Verrilli v. City of Concord,* 548 F.2d 262 (9th Cir.1977), the Ninth Circuit affirmed the principle it had announced in *Baldwin.* The ordinance under consideration in *Verrilli* contained a number of provisions governing the use of political campaign signs, including a provision which limited such signs to an area of four square feet. The court affirmed the district court ruling to the effect that the limitation was unconstitutional, on the basis of the trial court's finding that the city had not even attempted to justify its sign limitation. *Verrilli, supra,* 548 F.2d at 265. However, as in *Baldwin,* the court likened size restrictions to decibel restrictions and concluded that the former may be enforced "as long as the * * * limitations are not so restrictive as to foreclose an effective exercise of First Amendment rights." *Id.*

The court's most recent comment on the efforts of municipalities to regulate where and how political posters may be displayed is articulated in *Taxpayers for Vincent v. City Council,* 682 F.2d 847 (9th Cir.1982), *prob. jur. noted,* —— U.S. ——, 103 S.Ct. 1180, 75 L.Ed.2d 429 (1983). *Taxpayers* concerned an ordinance prohibiting entirely the posting of signs or handbills on numerous types of public property. The court commenced its discussion with a new statement of the principles to be applied to laws regulating First Amendment rights:

" '*First,* the law is presumptively unconstitutional and the state bears the burden of justification * * *. *Second,* the law must bear a "substantial relation" to a "weighty" governmental interest * * *. The law cannot be justified merely by the showing of some legitimate governmental interest * * *. *Third,* the law must be the least drastic means of protecting the governmental interest involved; its restrictions may be "no greater than necessary or essential to the protection of the governmental interest." ' "

*Id.* at 849. Applying these general principles to the ordinance at hand, the court concluded that the ordinance violated the First Amendment. The court had little difficulty with the asserted governmental interests: prevention of interference with the normal uses of public objects, prevention of visual clutter, and prevention of traffic hazards. *Id.* at 850. All of these interests in and of themselves were deemed to be "significant and weighty" or "substantial." *Id.* at 851, 852. However, the court doubted the sincerity of the city's commitment to its purported aesthetic interest. *Id.* at 852. Moreover, the court found no evidence demonstrating a relationship between the ordinance and the city's purported interest in traffic safety. Most important, the city had failed, in the judgment of the court, to demonstrate that an *absolute ban* against the posting of political signs on public property was the least restrictive alternative for accomplishing its purposes. *Id.* The court suggested as an alternative to the general ban an ordinance regulating the size, design, and construction of posters (citing *Baldwin* ) or a law instituting cleanup and removal requirements. *Id.* at 852–53.

Mindful of the relevant Ninth Circuit case law, the Court now turns to the merits of the instant application.

### III

Applying the above principles gleaned from Ninth Circuit law to the case at bar, the Court deals *seriatim* with the governmental interests, the relationship between the limitation and the governmental inter-

ests, and the restrictiveness of the limitations.

## A

Under the principles set forth in *Taxpayers*, the City, which carries the burden of proving that the limitations in question are constitutional, first must demonstrate that its interests in the limitations are "weighty" or "substantial." The governmental interests on which Section 675 is premised are set forth in subdivision (a) of the ordinance; they include: (1) aesthetics, (2) prevention of damage to public property, and (3) traffic safety.[6] The first and third interests have been acknowledged by the Ninth Circuit to be legitimate and substantial. *See Baldwin, supra,* 540 F.2d at 1366; *Taxpayers, supra,* 682 F.2d at 852. And there can be little doubt that the City retains a substantial interest as well in the protection of public property from damage.

Plaintiffs do not contest the significance of these interests in and of themselves, but, relying on certain dictum in *Taxpayers,* contend that the City is not engaged in a "comprehensive coordinated effort in its commercial and industrial areas to address other obvious contributors to an unattractive environment." 682 F.2d at 852 *quoting Metromedia Inc. v. San Diego,* 453 U.S. 490, 531, 101 S.Ct. 2882, 2904, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring). For this reason, plaintiffs argue, the City has failed to demonstrate that its asserted interest in aesthetics is substantial.

The Court is convinced that the City's interest in its aesthetic environment is "substantial" (*i.e.,* sincere). The City's Comprehensive Plan for development, a copy of which was submitted by the City as an exhibit, contains Urban Design, Recreation and Open Space, and Northeastern Waterfront elements, and addresses a variety of large- and small-scale aesthetic concerns, including: preserving architecturally/historically significant buildings and neighborhoods; regulating the scale (height and bulk) of new development projects; promoting visual harmony between older and newer structures; maintaining a unified landscape design; reenforcing the city's distinctive topographic (hill) forms; creating view corridors to the Bay; removing dilapidated piers and bulkhead wharves along the shoreline; designing a consistent set of street furniture; selecting durable trees and shrubbery for installation on various public grounds.

Signs of every variety, not simply temporary political signs, are identified throughout the Plan as a particularly troublesome contributor to visual blight.[7] Section 675 is part of a larger statutory scheme to curb the street clutter caused by large, garish, clashing signs. Other code provisions regulate extensively the size and placement of signs on private property within various zoning districts,[8] and on public park land.[9]

Nor are signs the only principal contributor to urban blight identified by the Plan;

---

**6.** Section 675(a) states as follows:

"The Board hereby finds and declares: The City and County of San Francisco has a compelling need to prohibit the posting of signs on public property in order to prevent the visual pollution caused by such signs and the resulting contribution to urban blight. Moreover, the placement of signs on public property causes damage to such property and, when done on or near traffic or directional signs or similar objects, threatens the safety of vehicular and pedestrian traffic. However, the Board is mindful of the importance of providing a forum for communication among citizens. While lamp posts and utility poles can provide such a forum, unrestricted use of signs would interfere with the clear view of traffic safety signs by motorists and with unobstructed use of public streets and side-

walks. In addition, unrestricted use of such poles would permit the placement of numerous signs of widely ranging sizes and shapes which protrude beyond the poles, thereby creating an aesthetically displeasing clutter of objects on and over public streets and sidewalks. A limitation on the size of objects placed on lamp posts and utility poles will eliminate unsightly clutter and will provide an opportunity for a greater number of persons to communicate by this means."

**7.** *See* Comprehensive Plan, Urban Design Element, p. 57; Northeastern Waterfront Element, pp. 20–22, 24.

**8.** Planning Code, Art. VI, § 601 *et seq.*

**9.** Park Code § 3.07.

overhead wiring is singled out for special attention as well.[10] The City currently is engaged in a project to place underground overhead utility wires. The project is complete in approximately one-third of the City.[11]

The City has enacted a number of measures in addition to the temporary sign regulations designed to ameliorate its serious litter problem. Other code provisions make it unlawful: to throw rubbish on the ground or to sweep it from one's dwelling into the street;[12] to permit litter to accumulate in front of one's dwelling;[13] to stack rubbish on top of or alongside public litter receptacles;[14] to distribute handbills to vacant premises or premises where other handbills have not been removed;[15] and to maintain refuse cans on sidewalks except on collection day.[16] In addition, owners of vacant lots must keep them litter free;[17] door-to-door solicitors must so place advertisements before a dwelling that they do not blow away;[18] contractors must maintain construction sites in a clean and litter-free manner;[19] and salesmen and restauranteers must bind or contain commercial refuse to prevent its dispersal in the wind or other elements.[20]

The evidence clearly demonstrates that the City's interest in its visual environment is "substantial."

## B

The city next must demonstrate that the size and placement limitations bear a "substantial relation" to its asserted governmental interests. The City urges that the limitations substantially promote traffic safety by eliminating obstructions to vehicles and pedestrians, and by reducing the "distraction value" of roadside signs. Moreover, the limitations purportedly decrease the likelihood that signs will be blown down, to injure pedestrians and to blind motorists.

As the court found in *Baldwin*, this Court finds here that the size limitation bears a somewhat "attenuated" relationship to the City's traffic safety interest. *See Baldwin, supra*, 540 F.2d at 1369. There is no evidence to suggest that smaller, but nevertheless visible, signs are any less distracting than larger signs. Given the universe of distractions facing motorists on our city streets, the "distraction value" posed by temporary signs is not sufficiently significant to justify the restriction on expression. *Id.* at 1370. Similarly, while common sense suggests that all things (such as design and construction) being equal, smaller signs are less likely than larger signs to be blown down, there is no evidence to indicate that temporary signs blown free by the wind have created a particularly acute traffic problem in the City. It is clear, however, that the obstructiveness of a sign is largely a function of its size. Consequently, a size limitation of some degree is substantially related to the City's interest in removing obstructions from the view of motorists and pedestrians.[21]

10. *See* Comprehensive Plan, Urban Design Element, p. 57.

11. The City also participates in a cooperative tree planting program between private citizens, who purchase the trees, and the Department of Public Works, which inspects the plant sites and, in some instances, plants the trees.

12. Police Code § 33.

13. *Id.* §§ 34, 36.

14. *Id.* § 35(a).

15. *Id.* § 975(b) and (c).

16. Health Code § 282.

17. Police Code § 79.

18. *Id.* § 976.

19. Public Works Code § 724.4.

20. Health Code § 283.

21. Precisely what *degree* of limitation is necessary to promote the City's interest is a different issue from whether this *kind* of limitation, a size limitation, is substantially related to the City's interests. While it is possible to determine whether another type of regulation would advance the City's interests better than a size restriction advances them, it is impossible to say whether a subtle difference in the degree of restrictiveness (*e.g.*, 12 inches or 18 inches)

Furthermore, the placement limitation in most respects significantly advances the City's interest in public safety and the protection of public property. The limitation effectively proscribes the placement of posters on curbstones, benches, hydrants, bridges, walls, span wires, trees, sidewalks, lawns, and "structures" located on public property.[22] For the most part, placing posters at these particular locations (with the possible exception of some walls and "structures") would be inconsistent with the nature and function of the object or area involved. *See Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). Plaintiffs take particular exception to the restriction prohibiting the placement of posters on span wires. In justification of the prohibition, the City has produced evidence that rain-soaked signs suspended from certain span wires may cause electrical "arcing" or create an open circuit in the municipal transit system, and that laymen cannot always determine which wires create the potential for such hazards.

Section 675 does permit placing posters on the most accessible and frequently used public space for such purposes, namely, utility poles and lamp posts, but requires signs so situated to conform to the shape of their supporting post or pole. This requirement also is substantially related to the City's interest in eliminating obstructions from the view of pedestrians and motorists.

The City claims in addition that the size and placement limitations substantially promote its aesthetic interest, by creating "clean" sight lines and abating the visual clutter created by signs of various shapes and sizes protruding beyond the edges of their supporting posts. Moreover, wind-blown signs contribute to the City's serious litter problem. The challenged limitations are substantially related to these concerns as well.

## C

*Taxpayers* suggests that the City finally must demonstrate that the challenged limitations are the least restrictive means available for achieving its purposes. The court, however, did not intend to apply the least restrictive means standard to limitations such as those under consideration here.

The limitations challenged here are "time, place, and manner" restrictions; they do not on their face prohibit the posting of temporary signs altogether; they simply regulate the place and manner in which they may be posted.[23] This observation is significant because "laws regulating time, place, or manner of speech stand on a different footing from laws prohibiting speech altogether." *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977). Such restrictions are permissible "provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of information." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).[24]

---

would promote the City's interests better than 11 inch restriction promotes them. The plaintiffs expend considerable heat arguing that an 11 inch limitation is entirely unrelated to the City's asserted interests. This question of inches is more properly reserved for consideration under the third prong of the *Taxpayers* standard, concerning the restrictiveness of the limitation. *See* section III–C *infra*.

**22.** *See* note 3, *supra*.

**23.** The Ninth Circuit implicitly recognized size limitations to be time, place, and manner regulations by comparing them to the decibel restrictions sanctioned in *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), perhaps the seminal case concerning time, place, and manner regulations.

**24.** The limitations considered here satisfy these requirements. They are justified on the basis of the City's traffic safety and aesthetic interests without reference to the content of the regulat-

Notwithstanding these pronouncements by the Supreme Court, the Ninth Circuit purports to articulate a least restrictive means principle that does not distinguish between time, place, and manner restrictions, such as those found in *Baldwin* and *Verrilli*, and total prohibitions, such as the one considered in *Taxpayers.* Yet, a close reading of the cases reveals that the court has never applied that principle to the type of time, place, and manner limitations under challenge here.[25]  In *Baldwin,* for example, in upholding the 16 and 80 square foot size limitations under consideration, the court observed:

"This legitimate interest [appearance of the community] might be served as well by slightly less restrictive size limitations, but such distinctions in degree become significant only when they can be said to amount to differences in kind."

*Baldwin, supra,* 540 F.2d at 1369.  Similarly, particularly with respect to the 80 square foot aggregate size limitation, the court concluded:

"[T]he unavailability of less restrictive alternatives [is] questionable, but the

burden imposed on free speech by this restriction is so minimal that generous allowances may be made for municipal preferences."

*Id.*  Clearly, the court declined to apply a strict least restrictive means standard to the limitations at issue.

The *Baldwin* court did not expressly indicate where the least restrictive means standard it had articulated earlier was to be applied and where it was not to be applied.  However, it becomes clear later in the opinion, with respect to another portion of the challenged ordinance,[26] that restrictions that amount to "a virtual ban" on free speech require greater justification by the state than less drastic time, place, and manner restrictions require.  *Id.* at 1370. In making this determination, the court suggested that "[t]he question is whether, on balance, a regulation * * * unduly restricts First Amendment rights."  *Id.* at 1370 n. 28.  A similar sentiment was expressed by the court in *Verrilli,* the only other Ninth Circuit decision to consider time, place, and manner restrictions on

ed signs.  *See* section III–B, *supra.*  These governmental interests are significant.  *See* section III–A, *supra.*  And the limitations leave open ample alternative means of communication. *See* pp. 1248–1249, *infra.*  Another requirement of time, place, and manner regulations is that they be "narrowly tailored" to further the State's legitimate interests.  *See Grayned v. City of Rockford,* 408 U.S. 104, 116–17, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).  This rule simply restates the "substantially related" standard considered above.

Plaintiffs claim that the limitations impermissibly discriminate between commercial and political speech because certain commercial signs are governed by less restrictive limits under other City ordinances.  *See, e.g.,* Planning Code, Article VI, § 607 (auto service station signs); Police Code, Article 10, § 666 (gasoline sale price signs).  Plaintiffs' claim is without merit.  The challenged limitations apply to *all* temporary signs posted on *public* property without distinction.  Plaintiffs refer to signs maintained on private property.  The City argues with some force that postering on public property creates problems not associated with private signs. People simply do not take the same care to maintain and remove signs posted on public property.  Also, private signs generally are of more permanent construction, which mitigates

the consequences of prolonged exposure to the elements.  The City is permitted to impose greater restrictions on modes of speech having a greater impact on its substantial interests.  *See Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949).  Furthermore, the City's ordinances as a whole discriminate in favor of temporary political signs.  Temporary signs may be posted on private property without limitation, while most commercial signs are governed by extensive regulations.  *See* Planning Code, Art. VI, § 601 *et seq.*

**25.**  Reference here is particularly to the type of time, place, and manner limitation which sets forth specific measurements (*e.g.,* 11 inches) above which a particular mode of expression will not be permitted.

**26.**  This provision of the ordinance limited to 64 square feet the aggregate area of signs posted throughout the City on behalf of a single candidate or issue.  The Court noted that as a consequence only four signs of the modest size of 16 square feet could be posted in a geographic area encompassing 20 square miles and supporting a population in excess of 55,000 people.  It was on this basis that the court concluded the provision amounted to a virtual ban on political postering.

where temporary posters may be placed. There, the court stated that size limitations may be upheld as long as they are not "so restrictive as to foreclose an effective exercise of First Amendment rights." *Verrilli, supra,* 548 F.2d at 265.

Thus, the relevant inquiry is not whether less restrictive limitations might have been chosen by the City, but whether the chosen limitations are unduly restrictive.[27]

The limitations challenged here are not so restrictive as to foreclose an effective exercise of First Amendment rights. The Court finds, from an examination of sample signs submitted by the City, that temporary signs of proper design and coloring, in compliance with the ordinance can be seen by passing motorists and pedestrians. It is true that the volume of information cannot be as great on signs within the limitations as on larger signs. Still, the message that the plaintiffs seek to convey, essentially the name of a political candidate (or ballot proposition) and the office for which he or she is campaigning, can be conveyed quite effectively on complying posters.[28]

Moreover, lengthier messages in smaller print (even type) clearly are visible to a substantial portion of plaintiffs' audience: pedestrians. That passersby in vehicles may be unable to read the message is not conclusive. Time, place, and manner restrictions may have the effect of limiting the number of people with whom the speaker or his message comes into contact. *See*

*Heffron, supra* (state may confine members of a religious organization distributing literature to a booth on state fair grounds); *Kovacs, supra* (state may regulate the volume of sound emitted from a loud speaker). And plaintiffs' claim to motorists as a potential audience is questionable in light of the City's substantial interest in traffic safety and the priority that road signs and traffic conditions must have in gaining motorists' attention.

The placement limitation does not unduly burden those who wish to post temporary signs in the City. The evidence shows that there are approximately 38,000 lamp posts located throughout the City on which signs may be posted. In addition, there is a large but indeterminate number of utility (both telephone and municipal transit) poles available on which posters may be placed. When one compares what the limitation permits with what it forbids in the placement of signs, it is apparent that substantial opportunity remains for placing posters on public property.

In addition, the limitations leave open ample alternative means of communication. *See Heffron, supra,* 452 U.S. at 654–55, 101 S.Ct. at 2567; *Baldwin, supra,* 540 F.2d at 1368. Candidates still may distribute handbills or leaflets, canvass door-to-door (except where "no solicitation" signs are posted), or hire billboard space. Even recognizing the unique attributes of placing posters on public property for political

27. The Court is of the opinion that a least restrictive means standard is particularly inappropriate in the context of limitations that prescribe specific measures above which First Amendment activity will not be permitted. Such limitations necessarily reflect an estimate by the State as to where the line should be drawn to effect its purposes. It is the rare case where the state can demonstrate that its legitimate interests could not be preserved by a slightly (*i.e.,* a difference in degree, not in kind) less restrictive limitation. Where an ill-defined governmental interest, such as aesthetics, is concerned, the state's burden under a least restrictive means approach is all but impossible to sustain. This case illustrates the point nicely. Plaintiffs would like to post signs fifteen inches in height but the City imposes an eleven inch size restriction on signs posted on public property. It simply cannot be argued that the City's

interest in aesthetics would be all but destroyed by a fifteen inch limitation. Nor could the argument be sustained, when the next plaintiff files suit, with respect to a twenty inch limitation; or a twenty-four inch limitation; or a thirty inch limitation; and so on. Of course, the effectiveness with which the City protects its interest diminishes with each successive suit. The better course is that followed by the Ninth Circuit in *Baldwin* and *Verrilli:* the propriety of the restriction must be determined by its effect on First Amendment rights and not by the availability of less restrictive measures.

28. This fact is not without significance because of the importance the Ninth Circuit has attributed to the unique characteristics of political posters. *See* note 29, *infra.*

purposes,[29] alternative means remain for this kind of communication. The limitations challenged here, of course, regulate the placing of posters only on public property; anyone may post temporary political signs of any size on private property.

Finally, plaintiffs have presented no evidence to support their entirely conclusory assertions that signs of eleven inches are illegible or that the challenged limitations amount to an effective ban on placing political posters on public property.[30] While the Court recognizes that the City carries the ultimate burden of proving the constitutionality of its limitations, the Court must look to plaintiffs to make at least a *prima facie* showing that their speech or someone else's speech is unduly burdened or foreclosed by the ordinance. Plaintiffs fail to make such a showing.

### IV

For the reasons stated above,

IT IS HEREBY ORDERED that plaintiff's application for declaratory and injunctive relief is DENIED. There is no basis in federal law to hold the City liable for compensatory damages.[31] The case is dismissed.

---

29. The Ninth Circuit has stated on a couple of occasions that:

"[M]eans of political communication are not entirely fungible; political posters have unique advantages. Their use may be localized to a degree that radio and newspaper advertising may not. With the exception of handbills, they are the least expensive means by which a candidate may achieve name recognition among voters in a local election."

*Taxpayers for Vincent v. City Council,* 682 F.2d 847, 850 (9th Cir.1982) *citing Baldwin v. Redwood City,* 540 F.2d 1360, 1368 (9th Cir.1976).

30. The Court attributes no weight to the photograph of the miniature (8½ × 11) Doris Ward sign attached as Exhibit A to plaintiffs' counsel's declaration in support of motion for preliminary injunction. The photograph is taken from a single spot and at a distance obviously calculated to render the sign unreadable.

31. As neither party has chosen to brief the state constitutional issue, the Court declines to exercise its pendent state claim jurisdiction.