**ARLINGTON COUNTY REPUBLICAN COMMITTEE, et al., Plaintiffs,**

v.

**ARLINGTON COUNTY, VIRGINIA, et al., Defendants.**

**Civ. A. No. 91–1527–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 28, 1992.

Victor Glasberg, John Zwerling, Alexandria, Va., for plaintiffs.

Carol McCoskrie, Asst. County Atty., Arlington, Va., for defendants.

## MEMORANDUM OPINION

CACHERIS, Chief Judge.

At issue before the court is the constitutionality of certain provisions of an Arlington County, Virginia ordinance governing the display of signs. On January 13, 1992, two political parties, several 1991 candidates for political office in Arlington County, and several citizens of Arlington County (collectively "the Political Parties") challenged the ordinance by filing this motion for summary judgment and permanent injunctive relief. Defendants, Arlington County, Virginia and its zoning administrator, Susan Ingraham, cross-claimed for summary judgment. After careful consideration, and for the reasons stated below, the court finds that each challenged provision of the ordinance violates the First Amendment guarantee of freedom of speech.

## I. BACKGROUND

On December 8, 1990, the Arlington County Board adopted Ordinance No. 90–39, effective February 15, 1991, regulating signs in the County. The challenged provisions of the ordinance limit the number of temporary signs that may be posted in residential districts, allow seven work days for the processing of permit applications, exempt only owner identification signs from a general ban on portable signs displayed on vehicles, and limit the content of signs displayed at commercial sites. These provisions are reproduced in pertinent part in the margin.[1]

---

1. Challenged provisions of ordinance:

A. *Administration*

1. A sign permit shall be obtained from the zoning administrator before any sign or advertising structure is erected.... A sign permit shall be approved or rejected within seven (7) work days. Upon request, a statement of the reasons for denial of a sign permit shall be provided within thirty (30) days after rejection....

....

C. *Prohibited Signs*

The following types of signs are prohibited and shall not be permitted by variance:

....

7. Any portable sign, including any signs displayed on a vehicle which is used primarily for the purpose of such display. This shall not include identification signs on vehicles identifying the owner of the vehicle, or bumper stickers.

....

E. *Signs Permitted in All Districts Without Permits*

No permit shall be required for any of the following signs and the same may be displayed as freestanding signs on private property, unless otherwise specifically noted, in any district:

....

7. One (1) noncommercial or "for sale," "rent," or "lease" sign or a sign advertising construction companies, contractors, or others performing work or services on a site on a temporary basis, not exceeding a total area of three (3) square feet, which may not be lighted. Two (2) riders, each with a total area not exceeding .75 square feet, may be attached to such signs.

....

F. *Signs Permitted in All Districts With Permits*

....

4. Temporary noncommercial signs are permitted in residential districts subject to the following:

....

f. No more than one (1) sign is permitted for each principal dwelling unit.

g. The sign may be freestanding or placed in a window.

....

G. *Signs Permitted in All "C" and "M" Districts With Permits*

On October 18, 1991, the Political Parties filed a motion for preliminary injunction against Defendants. The motion was filed prior to the November 5, 1991 Arlington County general election in which there were seven contested races. (Sellars Aff. ¶ 3.) The Political Parties sought to challenge the longstanding domination of Arlington politics by the Democratic Party and its incumbents and insisted that the challenged provisions of the sign ordinance thwarted their efforts to do so. By order entered October 25, 1991, this court granted preliminary relief. The Political Parties have returned to court seeking to make that relief permanent. The court will now reach the merits of their claims.

## II. SECTION F(4)(f): THE TWO–SIGN LIMIT

Under § F(4)(f), County residents may post a single sign, not to exceed four square feet, on their property or in their windows. The County construes § E(7) to permit one additional sign of up to three square feet. The Political Parties accept the County construction for purposes of this action and the court will therefore assume that the ordinance permits two signs to be displayed in residential areas.

The essence of the Political Parties' objection to § F(4)(f) is that in restricting residents to posting two political signs, the ordinance fails to leave open ample alternative channels of communication and is thus unconstitutional. The County disagrees.

The First Amendment guarantee that the freedom of speech shall not be abridged protects the free flow of ideas in a democratic society. When a citizen exercises her freedom of speech, she is exercising a right that the Supreme Court has characterized as "l[ying] at the foundation of free government by free men." *Schneider v. State*, 308 U.S. 147, 161, 60 S.Ct. 146, 151,

84 L.Ed. 155 (1939). In recognition of the importance of free speech to our political process, the Court has also stated that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971); *see also Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989); *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam). By limiting the number of signs that may be displayed in front of a dwelling, § F(4)(f) of the Arlington County ordinance diminishes the quantity of political communication open to Plaintiffs and thereby raises a First Amendment issue. Whether § F(4)(f) rises to the level of a First Amendment violation, however, must be answered by balancing the extent to which it inhibits communicative activity against the values, interests, or rights it serves.

Prior to engaging in this balancing process, the court recognizes that a government's ability to regulate speech "significantly increases as the mode of expression moves from pure speech to speech combined with conduct." *Baldwin v. Redwood City*, 540 F.2d 1360, 1366 n. 10 (9th Cir.1976), *cert. denied sub nom. Leipzig v. Baldwin*, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (citing *California v. LaRue*, 409 U.S. 109, 117, 93 S.Ct. 390, 396, 34 L.Ed.2d 342 (1973)). The *Baldwin* court stated, and this court agrees, that the posting of a temporary political sign is virtually pure free speech. *Id.* at 1366. Hence, as it evaluates the County's "two-sign" restriction on speech, the court will bear in mind that pure political speech is entitled to the highest degree of First Amendment protection. *See Tauber v. Town of Longmea-*

Business signs identifying the products or services available on the premises or advertising a use conducted thereon may be displayed in "C" and "M" Districts under the conditions and to a maximum aggregate area of all signs as follows:

1. On the front wall of commercial buildings in all "C" and "M" Districts, one (1) sign with a maximum area of sixty (60) square feet for each tenant located on the front wall of the building. The maximum aggregate area of all signs shall not exceed two (2) square feet of sign area for each linear foot of width of the front wall of the building.

*dow,* 695 F.Supp. 1358, 1360 (D.Mass.1988) (citation omitted).

Which analytical method the court employs depends on whether the County ordinance is content-based or content-neutral. The parties agree, as does this court, that the Arlington ordinance is neutral concerning speakers' points of view. In addition, there is no evidence that it has been applied in anything but an even-handed manner. Consequently, the court finds that the ordinance is content-neutral and will proceed accordingly.

▪ Reflecting a variation in analytical method employed by the Supreme Court, the parties have each proposed a different framework for reviewing a content-neutral ordinance of this kind. Plaintiffs suggest the following test under which courts must uphold time, place, or manner restrictions as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (citations omitted); *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). Defendants propose this alternative test:

[G]overnment regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The only substantive difference between the two tests lies in their final prongs. The *O'Brien* test requires the court to consider whether the ordinance employs the least restrictive means available, whereas the *Clark* test requires the court to determine whether the ordinance leaves open ample alternative means for communication of the message. In the Supreme Court's most recent billboard case, *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Court did not attempt to reconcile the two tests, but rather engaged in a "least restrictive means" analysis *and* an "ample alternative means" analysis. This court will follow suit.

Before beginning its analysis, the court notes that this is a case of first impression. Although courts outside this circuit have decided the question of whether a municipality may ban political signs in residential areas altogether[2] or may place size limitations on signs,[3] this court is unaware of any court that has grappled with the question of whether a municipality may constitutionally limit the number of political

---

**2.** *Baldwin,* 540 F.2d at 1372–73 (total exclusion of political posters from residential areas is unconstitutional; less restrictive means were available to achieve city's goals); *Runyon v. Fasi,* 762 F.Supp. 280, 284 (D.Haw.1991) (ordinance prohibiting outdoor political signs unconstitutionally restricted speech; ordinance was not content-neutral and less drastic means available for accomplishing purpose of preserving aesthetic beauty of city); *Gilleo v. City of Ladue,* 774 F.Supp. 1559, 1562 (E.D.Mo.1991) (ordinance permitting commercial signs and some others, but banning signs containing political or issue-related messages, was content-based infringement on freedom of speech in violation of First Amendment); *Town of Longmeadow,* 695 F.Supp. at 1361 (city bylaws banning posting of political signs but allowing others constituted impermissible content-based restriction on speech); *Matthews v. Town of Need-*

*ham,* 596 F.Supp. 932, 934 (D.Mass.1984) (town bylaw barring the posting of political signs on residential property was unconstitutional on its face because it accorded more protection to commercial speech than to noncommercial speech).

**3.** *Baldwin,* 540 F.2d 1360 (limitation of individual temporary political campaign signs to maximum area of 16 square feet and aggregate area of signs on a single parcel to 80 square feet does not offend First Amendment); *Ross v. Goshi,* 351 F.Supp. 949, 955 (D.Haw.1972) (18 square foot limitation on display surface of political campaign signs upheld); *State v. Miller,* 83 N.J. 402, 416, 416 A.2d 821, 828 (1980) (stating that "[i]nadequate sign dimensions may strongly impair the free flow of protected speech").

signs a citizen may display in front of his home.[4] This lack of issue-specific controlling authority is particularly important in the First Amendment context where the Supreme Court has declared that "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (footnote omitted). In *Metromedia*, the Court made clear that it was dealing only with the law of billboards. *Id.* Likewise, this court is concerned only with the law of political signs in residential neighborhoods. Because there is no controlling authority in this area, the court will look to analogous cases for the lessons it may learn from them, but the result in this case is by no means compelled by cases such as *Vincent* and *Metromedia* which do not concern themselves with this unique medium of expression.[5]

## A

The court turns now to analyzing the constitutionality of the County ordinance. The court has already determined that the ordinance is content-neutral. The next question is whether it furthers an important or substantial governmental interest.

### (1)

The governmental interests advanced by the County to justify the two-sign limit are aesthetics and traffic safety. The preamble to the ordinance offers the following insight into the County's purposes:

> These regulations are intended to: reduce the traffic hazards caused by such unregulated signs which may distract, confuse, and impair the visibility of motorists and pedestrians; ensure the effectiveness of public traffic signs and signals; protect property values by insuring the compatibility of property with that surrounding it; provide an attractive visual environment throughout the County; protect the character and appearance of the various neighborhoods in the County....

Arlington, Va., Zoning Ordinance § 34, Preamble (App.1990) (effective Feb. 15, 1991) (hereinafter "County Ordinance"). The County also presents the affidavit of its planning director, Mr. Robert Brosnan, who confirms that unregulated signs are inconsistent with the County's traffic-safety and aesthetics concerns. (Brosnan Aff. ¶¶ 2, 4.) It is well-settled that both traffic safety and aesthetics are substantial governmental goals. *See Vincent*, 466 U.S. at 807, 104 S.Ct. at 2130 (stating that "the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property [ ] constitutes a significant substantive evil within the City's power to prohibit"); *Metromedia*, 453 U.S. at 507–08, 101 S.Ct. at 2892–93 (finding that both traffic safety and aesthetics are substantial governmental goals); *see also Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 833 F.2d 43, 46 (4th Cir.1987) (interpreting *Metromedia* as foreclosing Plaintiff's argument that city's articulated goal of traffic safety is mere pretense); *Major Media of Southeast, Inc. v. City of Raleigh*, 792 F.2d 1269 (4th Cir. 1986) (interpreting *Metromedia* as standing for the proposition that a city may prohibit all off-premise signs and billboards for aesthetics and safety reasons). In accordance with the above-cited cases, the court finds that the County's goals are substantial and that § F(4)(f) of the ordinance meets the requirements of the second prong of the *Clark* and *O'Brien* tests.

---

**4.** In *Verrilli v. City of Concord*, 548 F.2d 262 (9th Cir.1977), the city ordinance at issue allowed "only one (1) [political] sign per office or measure to be placed per each parcel of land...." *Id.* at 265. *Verrilli* is not helpful, however, because the court never reached the question of whether the ordinance adequately protected political speech. Rather, the ordinance was declared unconstitutional due to the city's failure to meet its burden of demonstrating the necessi-

ty of the restriction. Incidentally, the City of Concord ordinance is also significantly more liberal than the Arlington County ordinance. *Id.*

**5.** The court makes this point in response to the County's heavy reliance on the *Vincent* and *Metromedia* decisions. *See, e.g.,* Defs.' Mem.Opp'n Summ.J. at 9.

(2)

■ Having recognized that aesthetics and traffic safety are substantial governmental interests, the next issue is whether the scope of the restriction on Plaintiffs' expressive activity is broader than necessary to protect those interests. The restriction on political expression that results from the County's means of reaching its goals is justified as a reasonable regulation of the time, place, or manner of expression only if it is narrowly tailored to serve the County's purposes. *See Schad v. Mount Ephraim*, 452 U.S. 61, 68–71, 101 S.Ct. 2176, 2182–83, 68 L.Ed.2d 671 (1981); *Schneider*, 308 U.S. at 164, 60 S.Ct. at 152. The court finds that the County ordinance is not so narrowly tailored.

As an initial matter, neither the County's evidence nor its arguments reveal any strong relationship between the ordinance and the County's goals. With regard to its goal of providing an attractive visual environment, the County never explains why a two-sign limit is narrowly tailored to meet that goal. Although Mr. Robert Brosnan's affidavit addresses the aesthetics issue, it is singularly unhelpful, consisting as it does of a declaration, without more, that "[a] proliferation of signs would be inconsistent with the County's goals of protecting the visual environment in the County." (Brosnan Aff. ¶ 2.)

The Political Parties, on the other hand, have presented evidence to suggest that unregulated sign posting would cause no problems either with the number of signs posted or the manner in which they are posted. As part of their motion for preliminary injunction, the Political Parties presented the affidavit of Mr. Duncan Sellars. Mr. Sellars is a registered voter who had, prior to the November 5, 1991 general election, posted two political signs in his yard but who desired to post a total of four signs. (Sellars Aff. ¶ 4.) The Political Parties also submitted the affidavit of Mr. Jimmy Palmer. Prior to the court's issuance of the preliminary injunction, the County had informed Mr. Palmer that his four political signs violated the County ordinance. (Palmer Aff. ¶¶ 2, 3.) In addi-

tion, as part of their Motion for Summary Judgment, the Political Parties submitted the affidavit of Mr. Michael Ward. Mr. Ward is a plaintiff in this case and was also a candidate for the Arlington County Board in the November 5, 1991 election. Mr. Ward swore to the following:

3. During the eleven days that followed the court's entry in this case of a temporary order enjoining enforcement of the County's sign ordinance, I noticed that additional signs were posted in numerous private residential lots and in private residential windows. I distinctly recall numerous lots in which at least three signs were so posted.

4. The largest number of signs I saw displayed on a private lot during the referenced eleven day period was five. These signs, and indeed all the campaign signs which I saw, were neatly posted in a front lawn.

(Ward Aff., Jan. 15, 1992, ¶¶ 3, 4.) Finally, the Political Parties submitted the affidavit of Ms. Joan Haring. Ms. Haring is a plaintiff in this lawsuit and Chairman of the Arlington County Republican Committee. She swore that subsequent to the issuance of the preliminary injunction, she noticed that "multiple political signs were placed on a significant but not overwhelming number of residential lots." She further swore as follows:

I do not recall seeing more than four political signs on any one lot. In all instances involving multiple signs on one lot, I felt that the signs had been placed in a tasteful manner so as not to impair the view of passing traffic or to detract from the visual environment.

(Haring Aff., Jan. 15, 1992, ¶¶ 3, 4.) In summary, the uncontradicted evidence before the court is that one citizen desires to post four political signs, another actually did post four political signs prior to the issuance of the preliminary injunction, and that, subsequent to the issuance of the preliminary injunction, no more than five political signs were posted in front of any one residence, and the signs were posted in a neat and tasteful manner. From the evidence presented, the court concludes that the ordinance functions in no impor-

tant, much less necessary, way to further the County's goals.

Considering the special circumstances that exist with regard to political signs in residential neighborhoods, it is not surprising that the County presented no evidence of an aesthetics problem that this ordinance was narrowly tailored to solve. For one thing, political signs are an infrequent and temporary phenomenon. Elections occur once a year and the County limits the time period for display of political signs to seventy days prior to the election and ten days after the election. County Ordinance § F(4)(f), (e). Moreover, unlike the *Vincent* case which involved the posting of signs on public property, here the court concerns itself with the posting of signs on private property. The distinction is critical. To state the obvious, public property is at once everybody's and nobody's property, while private property belongs to the individual alone. Human nature being what it is, people tend to take far better care of what belongs to them.[6] Applying this principle to the posting of signs, the Supreme Court has clearly stated that "private property owners' esthetic concerns will keep the posting of signs on their property within reasonable bounds." *Vincent*, 466 U.S. at 811, 104 S.Ct. at 2132. Considering the lack of evidence of an aesthetics problem caused by overzealous sign-posting, the temporary and infrequent nature of political elections, and a homeowner's interest in preserving his private property, the court concludes that the ordinance is only weakly related to the County's aesthetics goal.

The court reaches the same conclusion with regard to the County's traffic safety objective. Once again the County submits Mr. Brosnan's affidavit in which he borrows the words to the preamble of the ordinance to conclude that "[t]hese regulations further the purposes of reducing traffic hazards caused by unregulated signs which distract, confuse and impair the visi-

bility of motorists and pedestrians" and "ensure[ ] the effectiveness of public traffic signs and signals." (Brosnan Aff. ¶ 2.) From the affidavits submitted by the Political Parties, however, the court learned that once the two-sign limit was lifted, the additional signs posted were neatly displayed and not unreasonably numerous, thus presenting no obvious traffic safety problems.

In considering the relationship between the ordinance's two-sign limit and the goal of traffic safety, the court also observes that, as Washington metropolitan area residents, motorists in Arlington County face myriad distractions resulting from, for example, competing commercial advertisements, changing traffic patterns, and unpredictable pedestrians. In other words, motorists are accustomed to driving with distraction. The Ninth Circuit, noting the weak relationship between traffic safety and an ordinance restricting the aggregate area of political signs, arrived at the following conclusion:

> Considering the universe of distractions that face motorists on our city streets, temporary political posters are not sufficiently significant to justify so serious a restriction upon political expression.

*Baldwin*, 540 F.2d at 1370 (cited in *Runyon v. Fasi*, 762 F.Supp. 280, 283 (D.Haw.1991)). While traffic safety is admittedly a significant governmental objective, the County has failed to show that an ordinance regulating the number of signs that may be posted in residential areas has any important or narrowly drawn relationship to that objective.

Although it is theoretically possible that an ordinance providing only weak support for its stated goals, could also be the least restrictive means for promoting those goals, that is not the case here. In order to target its traffic safety goal more narrowly, the County could enact an ordinance specifically prohibiting the erection of signs

---

**6.** Plaintiffs' counsel made this point in a less formal manner when he pointed out that:

> Unfortunately, people take better care of their own stuff than they do somebody else's stuff, and the public's stuff is always at the bottom of the list. People will do whatever they want in the public areas that they will not do in their own backyards. They'll have a picnic in a public park and trash it, where they would not trash their own backyard.

(Tr.Prelim.Inj. at 9.)

that may obstruct the vision of drivers or interfere with traffic. While the County is also worried that too many signs might be distracting to drivers, distractions are a fact of life for urban motorists as discussed above. Accordingly, this court finds, as did the *Baldwin* court, that the distractions caused by temporary political signs are not of enough consequence to justify so serious a restriction upon political expression.

The County's aesthetics objective may also be achieved by means less restrictive of free speech. For example, the County could require that all signs be maintained in a state of good repair. In addition, it could, as the *Baldwin* court noted, "impose design restrictions that would bar the more unsightly posters, without impairing political expression." *Id.* These possibilities are in addition to the square footage and display-time restrictions the County currently imposes in order to promote its aesthetics and traffic safety goals. *See* County Ordinance § F(4)(a) (No one temporary noncommercial sign requiring a permit shall exceed four (4) square feet in area); § E(7) (No one sign not requiring a permit shall exceed a total area of three square feet); § F(4)(d), (e) (No signs shall be erected for more than seventy days prior to the event which they purport to advertise and all signs shall be removed within ten days after the event). Of course these measures do not prevent a citizen from neatly and safely posting twenty political signs in her front yard. The likelihood of this happening is, however, remote and, to the extent it does occur, it is simply the de minimis burden city residents must bear as part of living in a society that places a high value on free expression.

This conclusion is reinforced by an instructive portion of the *Vincent* opinion in which the Court discusses the *Schneider* case. In *Schneider*, the Court held that ordinances that absolutely prohibit handbilling on the streets are invalid because cities can less restrictively protect their aesthetics interest in avoiding litter by penalizing those who actually litter. *Schneider*, 308 U.S. at 162, 60 S.Ct. at 151. The *Vincent* Court was grappling with a very different aesthetics problem which it described as dozens of temporary signs posted throughout a public area where they would remain unattended until removed. *Vincent*, 466 U.S. at 809, 104 S.Ct. at 2131. In finding *Schneider* not applicable to the facts of *Vincent*, the *Vincent* Court wrote as follows:

> In *Schneider*, an antilittering statute could have addressed the substantive evil without prohibiting expressive activity, whereas application of the prophylactic rule actually employed gratuitously infringed upon the right of an individual to communicate directly with a willing listener. Here, the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself. In contrast to *Schneider*, therefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City.

This case is more like *Schneider* than like *Vincent*. Here, problems of aesthetics and traffic safety do not necessarily or normally follow from allowing the posting of more than two signs. In other words, such problems are not "created by the medium of expression itself," but are only a "possible by-product of the activity." As detailed above, there are multiple current and potential regulations that address the County's aesthetics and traffic safety concerns without inhibiting expressive activity. Because there are less restrictive alternatives the County might employ to meet its goals, this court find that § F(4)(f) of the ordinance is unconstitutional.

### (3)

The ordinance is also unconstitutional, argue the Political Parties, because it fails to leave open ample alternative means of communication.

Posting political signs is a mode of political expression with unique advantages. The *Baldwin* court points out that political signs are superior to television and radio advertising in allowing candidates to localize their advertising. Additionally, "[w]ith

the exception of handbills, [political signs] are the least expensive means by which a candidate may achieve name recognition among voters in a local election. *Baldwin,* 540 F.2d at 1368 (citation omitted). Justice Brennan has noted that political signs (1) allow candidates to be flexible in the format, typography, and graphics they choose to communicate their message; and (2) are easily read and understood by their viewers. *Vincent,* 466 U.S. at 819, 104 S.Ct. at 2136 (Brennan, J., dissenting). Echoing these observations, two Libertarian Party candidates submitted affidavits to the court in which they both state:

> [A]s a candidate not associated with either of the two major parties, I must rely on inexpensive and readily available grassroots campaign methods to achieve this goal. Temporary signs posted by my supporters in their yards is one of my most potentially effective campaign techniques for me to utilize under these circumstances.

(Sincere Aff. ¶ 3; Ward Aff., Oct. 16, 1991, ¶ 3.)

A constitutional problem arises, argue the Political Parties, because the alternatives to this unique mode of political expression are inadequate. The County argues in response that there are multiple alternative means of communication, allowing candidates and their supporters to:

1. make speeches in public areas;

2. canvas from door-to-door and in public places;

3. distribute handbills door-to-door and in public places;

4. appear at citizen group meetings;

5. advertise by radio, in magazines and newspapers, and by mail;

6. post signs at local businesses;

7. post signs on automobiles; and

8. post two signs in front of their residence.

(Defs.' Mem. Opp'n Pls.' Summ. J. at 13.)

These alternatives are insufficient for a number of reasons. Alternatives one through four, for example, demand a type of political participation that is direct and time-consuming. In an urban area filled with busy working people, it cannot be required that citizens have either the time or the inclination to directly solicit votes. Moreover, on the subject of handbilling specifically, candidate Michael Ward stated that he preferred signs on private property over handbills because "[a] great many handbills inevitably end up as litter, thereby causing not merely a blight in the effected [sic] community but understandable resentment of the source of the litter, *i.e.,* the campaign." (Ward Aff., Jan. 15, 1992, ¶ 5.) Paid advertising is also an inadequate alternative because of its expense. The Supreme Court recognizes that many citizens cannot afford to spend large sums of money to exercise their First Amendment rights. *Martin v. Struthers,* 319 U.S. 141, 146, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people."). Affixing a bumper sticker to one's car or placing a sign in the window of a local business is also an inadequate alternative because neither option addresses a citizen's right to engage in political expression at his private residence. The Supreme Court has clearly declared that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider,* 308 U.S. at 163, 60 S.Ct. at 151–52.[7]

With regard to the two-sign limit, the Political Parties present a variety of arguments for why it is an unacceptable alternative to a less numerically restrictive ordinance. First, the ordinance is drafted so that non-political signs count toward the

---

**7.** The court notes that posting a sign at one's residence allows a citizen to show a stronger and more personal level of support for a candidate than posting a sign almost anywhere else.

Additionally, in keeping with the strong American sentiment that one's home is one's castle, there is a not insignificant interest in preserving the fullest range of expression possible in that arena. This interest is not addressed by automobile bumper stickers or signs in store windows.

two-sign total. If, for example, one advertises a room for rent by placing a sign in a front window, one may then post only one political sign in the yard. *See* County Ordinance §§ E(7), F(4)(f). Secondly, the ordinance makes it very difficult to support candidates in multiple races. *See* Sellars Aff. (registered voter wishing to place sign in his yard to express support for Messrs. Sincere and Ward fears doing so because he already has two campaign signs in his yard); Evans Aff. (Republican-backed Independent candidate for the Arlington County Board states that his supporters who also support other political candidates have been forced to choose between posting his signs and posting the signs of other political candidates); Sincere Aff. (Libertarian candidate for Arlington County Treasurer states that by forcing voters to choose only two candidates for whom they may post signs, the ordinance "places severe restrictions on the ability of my supporters to express their support for me to their neighbors and passers-by"). In the election year at issue, there were seven contested races in Arlington County. (Sellars Aff. ¶ 3.) The number of races of course jumps in a presidential election year when, in addition to the presidential race, there is a congressional race and perhaps a Senate race. (Pls.' Mem.Supp.Summ.J. at 37.) This situation, argues the Political Parties, creates a systemic bias in favor of incumbents and places political outsiders at a disadvantage. (Pls.' Mem.Supp.Prelim.Inj. at 32.)

The court agrees with the Political Parties that two signs do not allow a full enough measure of political expression. In addition to the arguments made by the Political Parties, the court notes that the impact of the two-sign limit is compounded by the fact that many households contain more than one voting-age individual. This means that, assuming that the members of the household do not always agree on which candidates they will post signs for and in which races, each member is actually entitled to less than two signs worth of political expression.

■ The court's conclusion that the ordinance fails to leave open ample alternative means of communication reflects the principle recently espoused by the Supreme Court that "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. National Fed'n of Blind, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 2674, 101 L.Ed.2d 669 (1988). Because the two-sign limit fails to leave open ample alternative means of communication and because it also fails to employ the least restrictive means for achieving its objective, the court finds that § F(4)(f) of the ordinance is an unconstitutional restraint on free speech.[8]

## III. SECTION A(1): THE ADMINISTRATION OF THE PERMIT PROCESS

■ Section A(1) of the Arlington County ordinance allows the zoning administrator seven days to approve or reject a sign permit application and, in the case of a denied application, thirty days to provide a written statement of the grounds for denial. Plaintiffs argue that these waiting periods constitute unconstitutional prior restraints on political expression. The court agrees that the waiting periods are unconstitutional, but employs a different method of analysis.

Because posting signs in front of one's home is conduct clearly protected by the First Amendment, it is incorrect to attribute that protection to the prior restraint doctrine. Laurence H. Tribe, American Constitutional Law § 12–34, at 1041 (2d ed. 1988) (prior restraint doctrine properly applies to conduct that is at least arguably outside the ambit of substantive first amendment protection, yet inside the ban on prior restraints). Consequently, the court will begin its analysis by making the same content-based/content-neutral distinction it employed with regard to the two-sign portion of the ordinance.

---

8. The court emphasizes that it is ruling only that two signs are too few. The court in no way reaches the question of how many signs might pass constitutional muster. The principle of separation of powers requires that this issue be resolved by Arlington County elected officials.

Section A(1) of the ordinance imposes the same waiting periods on everyone who desires to post a sign, regardless of the content of their message. There is no evidence in the record that the ordinance was enacted or enforced to censor or to favor particular viewpoints. Nor is there any evidence that it favors commercial over noncommercial speech. The court concludes, therefore, that the ordinance is content-neutral.

The court will apply the *O'Brien* test to review a content-neutral ordinance of this type. That test, as discussed in Part II, provides as follows:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).[9]

The County argues that the seven and thirty-day time limits are necessary to allow the zoning administrator to review applications for large, complex, permanent commercial signs. (Defs.' Mem.Opp'n Prelim.Inj. at 28; Defs.' Mem.Opp.Summ.J. at 20.) It is clear that providing a reasonable time for its administrator to review applications is an important governmental interest. Although the County is acting to promote an important interest, the court finds that the lengthy waiting periods are not the least restrictive means for furthering that interest and are thus unconstitutional based on the fourth prong of the *O'Brien* test.

As an initial matter, the inhibitory impact of the waiting periods on political speech is beyond cavil. First, as pointed out in *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.1984), all advance notice requirements inhibit speech.

The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulation discourages citizens from speaking freely.

*Id.* (citing *Rosen v. Port of Portland*, 641 F.2d 1243, 1249 (9th Cir.1981)). Second, "the delay inherent in advance notice requirements inhibits speech" by "outlaw[ing] spontaneous expression." *Id.* These restraints have unique repercussions on elections. The energy associated with an election builds during the campaign period and explodes in a flurry of interest and activity during the final days before the vote. The seven-day time limit has the very real potential of preventing a candidate from incorporating signs as part of a final days strategy change or push to sway the undecided. It also prevents those voters whose interest was piqued late in the campaign from using signs to express their preferences.[10]

Various courts have made comments that support this court's conclusion that the seven-day waiting period is too long to pass constitutional muster. "[T]iming is of the essence in politics.... [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163, 89 S.Ct. 935, 945, 22 L.Ed.2d 162 (1969). A delay "of even a day or two" may be intolerable

---

9. The court declines to follow the methodology it employed in Part II where it applied both the *O'Brien* and the *Clark* tests because an inquiry into whether the administrative portion of the ordinance leaves open ample alternative means of communication is illogical. Such an inquiry is also unnecessary as § A(1) fails to meet prong four of the *O'Brien* test and is unconstitutional on that basis.

10. The court's emphasis on political campaign signs is not intended to minimize the impact the seven-day delay has on those citizens who wish to post signs expressing their viewpoints on controversial issues or events of the day. Such signs attract more attention and generate more comment when posted during or directly after a significant event rather than seven days later. Consequently, they may also be unnecessarily burdened by the seven-day waiting period.

when applied to " 'political' speech in which the element of timeliness may be important." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 182, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968). "Timeliness is essential to effective dissent. Delay may stifle protest as effectively as outright censorship." *Women Strike for Peace v. Hickel*, 420 F.2d 597 (D.C.Cir. 1969).

Turning from the burden inherent in the seven-day time limit, the court will now consider the County's obvious and less restrictive alternative for providing its administrator with adequate time to review applications. Because the seven-day limit is necessary, according to the County, to review applications for *permanent* commercial signs, the limit could be retained only for those complex cases. There is no question that the County can act within a shorter period of time because, in fact, the County's current practice is to act on applications for temporary permits at the time of request. (Ingraham Aff. ¶ 12.) In short, the County's own practice makes it clear that the seven-day limit is not the least restrictive means for promoting its objectives.

Likewise, thirty days is too long for a temporary political sign applicant to wait for a statement of reasons for denial of a permit. If this provision were allowed to stand, the statement of reasons would arrive after all the votes had been cast in most cases. Where elections or current events are concerned, the turn-around time must be brief so that applicants may amend their rejected applications in accordance with the County's "statement of reasons" and still have time to post their signs before public interest fades. The thirty-day limit may be necessary for a complex commercial sign application, but cannot be imposed on a relatively simple temporary political sign application where the First Amendment interest is so great and less restrictive means are available.

In an attempt to save the ordinance, the County argues that the seven and thirty-day limits are "outside limit[s] within which

a government official must take action" and that, in fact, permit applications are acted upon at the time of request and reasons for denial are provided orally on the spot. (Defs.' Mem.Opp.Pls.' Summ.J. at 20.) The Political Parties respond that because this is not a vague statute, the zoning administrator's narrowing construction cannot save those portions of the ordinance that are unconstitutional without it. (Pls.' Mem.Opp.Defs.' Summ.J. at 2.) Specifically, the Political Parties argue:

> What the County cannot do is take a dog walking ordinance and turn it into a cat walking ordinance. What the County cannot do is pass a law that says A and then say well, it says A but really how we're going to enforce it is B.

(Tr.Prelim.Inj. at 14.) This court agrees.

In *Beck v. Communications Workers of Am. (C.W.A.)*, 776 F.2d 1187 (4th Cir.1985), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), the Fourth Circuit cited the Supreme Court for the proposition that:

> a statute challenged for unconstitutionality under the First Amendment may be sustained if, as a result of a reasonable narrowing construction consonant with the legislative purpose reflected in the statute, the constitutional objection may be removed or obviated.

*Id.* at 1199 (citing *Ellis v. Brotherhood of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)). In the case before the court there is no question that the legislators meant to give the zoning administrator seven work days to act on permit applications and thirty days to provide reasons for denial. This court declines to write non-binding limits stating otherwise into an ordinance whose meaning is plain.

There are clear dangers associated with a contrary ruling. For example, although Ms. Ingraham, the current administrator, may issue permits on the spot, the next administrator might not.[11] There is also the potential for an administrator to vary the length of time she takes to process an application based on her opinion or the

---

**11.** Counsel for the County admitted that the interpretation of the ordinance could change

with a new administrator, but stated that, in fact, over at least the last two or three adminis-

County's opinion of a sign's content. This power has been described as the ability "to achieve indirectly through selective enforcement a censorship of communicative content that is clearly unconstitutional when achieved directly." Tribe, *supra,* § 12–38, at 1056 (citations omitted). It is this potential for the discriminatory exercise of discretion that has prompted the Supreme Court to prohibit courts from presuming that officials given unbridled discretion will act in good faith. *See City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988) (doctrine forbidding unbridled discretion in regulation of speech precludes courts from presuming that official given unbridled discretion will act in good faith and adhere to standards which are absent from the face of the statute).

In conclusion, the court finds that because First Amendment liberties are too important to trust to the good faith of an administrator, the seven and thirty-day time limits cannot be saved by the County's contrary constructions of these clear statutory provisions. The limitations on the waiting periods suggested by the County will have constitutional effect only if they are codified by statutory amendment.

## IV. SECTIONS C(7) AND G(1): PORTABLE SIGNS AND SIGNS IN COMMERCIAL AREAS

The Political Parties' final objection is to two sections of the ordinance that they claim favor commercial over non-commercial speech in violation of the First Amendment.

### A. Section C(7): Portable Signs

Section C(7) of the County ordinance prohibits:

> Any portable sign, including any sign displayed on a vehicle which is used primarily for the purpose of such display. This shall not include identification signs on vehicles identifying the owner of the vehicle, or bumper stickers.

The Political Parties argue that the ordinance permits "a portable sign on the side or top of a car reading 'Don Beyer's Volvo' but not one which says 'Vote for Don Beyer.'" (Pls.' Mem.Supp.Summ.J. at 10–11.) The problem, argue the Political Parties, is that by making an exception for signs identifying the owner of the vehicle but not for signs communicating the owner's political viewpoint, the ordinance favors commercial speech over non-commercial speech.

At a more basic level, the Political Parties are arguing that the County is restricting speech because of its content, that is, because of the ideas or information contained in the speech or because of its general subject matter. It is not necessary that the ordinance discriminate against political speech directly or obviously in order for a court to find that the ordinance is content-based. According to Professor Tribe, regulation of certain activities "implicates the first amendment regardless of whether such regulation is cast in terms of message, or motivated by message." Laurence H. Tribe, American Constitutional Law § 12–7, at 829. Regulation of signs is one of these activities. *Id.*

A number of recent cases have made clear that whether an ordinance directly or indirectly prohibits political speech, it is unconstitutional if it provides more protection for commercial speech than for political speech. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 513, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981) (recognizing that noncommercial speech is accorded greater protection under the First Amendment than is commercial speech and striking down ordinance that imposed a greater restriction on political than on commercial billboards); *Gilleo v. City of Ladue,* 774 F.Supp. 1559, 1562 (E.D.Mo.1991) (ordinance permitting commercial signs and some others, but banning political signs, is content-based infringement on freedom of speech); *Tauber v. Town of Longmeadow,* 695 F.Supp. 1358, 1361 (D.Mass.1988) (ordinance banning political signs in residential areas, but permitting commercial signs, favors commercial speech over non-commercial speech and is thus unconstitutional); *Matthews v. Town of Needham,* 596 F.Supp. 932, 934 (D.Mass. 1984) (town bylaw barring the posting of

trators, the interpretation had remained constant. (Tr.Summ.J. at 9–10.)

political signs on residential property was unconstitutional because it accorded more protection to commercial speech than to noncommercial speech).

■ By creating an exception for owner identification signs, the County is necessarily admitting that at least one communicative interest is stronger than the County's competing interests in aesthetics and traffic safety. Because it is well-established, however, that noncommercial speech receives more protection than commercial speech in our constitutional system, an ordinance that inverts this point of law is necessarily unconstitutional.

The County does not dispute that § C(7), as written, prefers commercial over noncommercial speech. Instead, the County argues that the ordinance *as applied* is content-neutral. Citing the affidavit of its zoning administrator, the County maintains that "wherever commercial speech is permitted on a sign under the Sign ordinance, noncommercial speech may be substituted." (Ingraham Aff. ¶ 3.) For the reasons stated in Part III in which the court declined to write non-binding language into the ordinance, this argument fails. Insofar as the County permits portable signs at all, it may not choose to restrict their content to exclude political speech.

B. Section G(1): Signs in Commercial Areas

■ The Political Parties also object to § G(1) of the ordinance. This section permits commercially-zoned establishments to post signs of up to sixty square feet if those signs identify the products or services available on the premises or advertise a use conducted thereon. The Political Parties have standing to object to this section because one of the plaintiffs, the Arlington County Republican Party, desires to place political signs in the window of its office located in an area zoned for commercial use. (Haring Aff., Oct. 17, 1991, ¶¶ 2, 4.)[12]

Their specific objection is that § G(1) is another example of a content-based restric-

tion on political speech in commercial areas. Specifically, "a supermarket might advertise a free pot with every chicken, but not post a sign for a candidate promising to put a chicken in every pot." (Pls.' Mem.Supp. Summ.J. at 11.) The County defends once more on the premise that the ordinance is saved because, irrespective of whether it is constitutional on its face, it is constitutional as applied. (Defs.' Mem. in Opp'n Summ.J. at 17.) (citing Ingraham Aff. ¶ 3.) Like § C(7), § G(1) clearly favors commercial over political speech. For that reason and because the County's argument fails for the reasons stated in Part III of this opinion, the court finds that § G(1) is an unconstitutional content-based restriction on political speech.

For all of the reasons stated above, the court grants Plaintiffs' motion for summary judgment on the four specified claims discussed herein, and permanently enjoins enforcement of the challenged provisions.

---

**12.** The County challenged Plaintiffs' standing to object to § G(1) based on the argument that not all of the plaintiffs owned commercial property on which they desired to post signs. It is enough, however, in a case for injunctive relief, that at least one of the plaintiffs has an interest that may be constitutionally protected. Ms. Haring's affidavit clearly illustrates that the Political Parties have met this requirement.